IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Ms. H., individually and as | ) | |
| mother and next friend of | ) | |
| T.H., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) CIVIL ACTION NO.  2:10cv247-WHA-SRW | |
| | ) | (WO) |
| MONTGOMERY COUNTY | ) | |
| BOARD OF EDUCATION | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This case is before the court on cross-motions for summary judgment and judgment on

the pleadings.  The Plaintiff in this action, Ms. H, who is filing this lawsuit individually and on

behalf of her daughter, T.H., filed a Motion for Summary Judgment, or in the Alternative, for

Judgment on the Pleadings on August 6, 2010 (Doc. #27).  On August 31, 2010, the Defendant,

Montgomery County Board of Education (the "Board"), filed a Response to Ms. H's Motion for

Summary Judgment, or in the Alternative, for Judgment on the Pleadings and the Board's

Motion for Summary Judgment, or in the Alternative, for Judgment on the Pleadings (Doc. #31).

Ms. H filed an Amended Complaint in this court on June 9, 2010, against the Board.  In

the Amended Complaint, Ms. H (1) alleged violations of § 504 of the Rehabilitation Act of 1973;

(2) seeks to appeal all issues on which she did not prevail at an Individuals with Disabilities in

Education Improvement Act ("IDEA") hearing; and (3) seeks to recover attorney's fees with

respect to the issues she prevailed on at the IDEA hearing.  The motions currently before the

court deal only with the appeal of the IDEA hearing.  The court concludes that the Board's motion is due to be GRANTED IN PART AND DENIED IN PART, and Ms. H's Motion is due to be DENIED.

## II.  STANDARD OF REVIEW

Eleventh Circuit precedent holds that "the usual [Rule] 56 summary judgment principles do not apply in an IDEA case." *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003).  Instead, a district court's review of an IDEA appeal is "'better described as a judgment on the record.'"  *Id.* at 1313 (citing *Beth B. v. Van Clay*, 282 F.3d 493, 496 n.2 (7th Cir. 2002)).  Accordingly, "'summary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute.'" *Id.* (citing *Beth B.*, 282 F.3d at 496 n.2).

When a district court reviews findings and decisions made during IDEA administrative hearings, the court receives the administrative record, and renders a decision based on a preponderance of the evidence.  *See Walker Cnty. Sch. Dist. v. Bennett*, 203 F.3d 1293, 1297-98 (11th Cir. 2000).  Additionally, "[w]hen a party moves for summary judgment in [an IDEA case], he does not implicitly reserve a right to a trial if the motion is denied." *Maricus W. ex rel. Marvin M. v. Lanett City Bd. of Educ.*, 141 F. Supp. 2d 1064, 1069-70 (M.D. Ala. 2001) (De Ment, J.).

The IDEA specifically provides that the court may take additional evidence and may fashion relief that it deems appropriate.  20 U.S.C. § 1415(i)(2); *Weiss by Weiss v. Sch. Bd. of Hillsborough Cnty.*, 141 F.3d 990, 992 (11th Cir. 1998).  In this case, neither side has asked to

present additional evidence, and the court bases its determination on a review of the record, including all exhibits.

The court reviews legal conclusions by the hearing officer under a *de novo* standard. *Maricus W.*, 141 F. Supp. 2d at 1065. "[T]he extent of deference to be given the administrative findings of fact is an issue left to the discretion of the district court." *Jefferson Cnty Bd. of Educ. v. Breen*, 853 F.2d 853, 857 (11th Cir. 1988). "[F]indings of fact made in administrative proceedings are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why." *M.M. v. School Dist. of Greenville Co.*, 303 F.3d 523, 531 (4th Cir. 2002). The court may accept or reject the findings of the hearing officer, but must be careful not to substitute its judgment for that of the state educational authorities, and accords the administrative decision due weight. *Maricus W*, 141 F.Supp.2d at 1065-66. Accordingly, "[t]he party challenging the hearing officer's determination bears the burden of convincing the court that [the hearing officer] was incorrect." *Nguyen v. District of Columbia*, 681 F. Supp. 2d 49, 51 (D.D.C. 2010); *see also Marshall Joint Sch. Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2010); *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1103 (9th Cir. 2007); *Angevine v. Smith*, 959 F.2d 292, 295 (D.C. Cir. 1992).[1]

### III.  FACTS

The submissions of the parties, including the hearing officer's decision, establish the following facts:

---

[1]Because judgment on the record is due to be granted in this case, the court need not address either party's motion to the extent that it requests judgment on the pleadings.

**A.      Elementary School: ADHD, and § 504**

T.H. is a student in Montgomery Public Schools ("MPS").  She began attending MPS as a first grade student in the Fall of 1999.  From that time, she has had difficulties in school.  She had behavioral problems beginning in first grade.  In second grade, she was diagnosed with ADHD and placed on medication, yet continued to have behavioral problems.  Subsequently, at Ms. H's request, T.H. was placed on § 504 services due to her ADHD problems.  Pl.'s Ex. 1 at 1. Accordingly, T.H. began receiving § 504 accommodations and interventions.

**B.      Middle School: T.H.'s Health Problems and School Difficulties**

In seventh grade, T.H. developed a health condition that caused her to lose her ability to adequately control her bladder.  This sometimes caused her to leave school to shower and change clothes.  T.H. was also diagnosed with another health condition at the end of eighth grade: a mitral valve prolapse, which caused her to have trouble breathing and an abnormal heartbeat. MPS concluded that these were health conditions that supported T.H.'s eligibility for § 504 services.  Pl.'s Exs. 3, 4.  Accordingly, MPS required T.H.'s teachers to allow T.H. to make up work missed due to her absences caused by these conditions.

T.H. also had difficulties in school.  Although she passed all of her classes in school, some evidence suggests that she did not actually earn these grades.  Specifically, Ms. H claimed that the § 504 coordinator told Ms. H that T.H.'s grades were modified at the end of the school year so that T.H. would pass her classes.  Hearing Transcript ("Tr.") 621:2-624:13.

4

**C.      High School: T.H.'s Academic Problems Continue**

T.H. continued to struggle in high school, despite continuing to receive § 504 accommodations for her health problems.  In fact, her grades have declined "every year that she has attended school."  Hearing Officer's Decision (hereinafter "H.O.'s Dec.") at 6.

In T.H.'s ninth grade school year, in 2007-08, T.H. did poorly in math, science, and English.  However, T.H. passed all of her ninth grade courses, scoring average grades in all subjects except algebra.  T.H.'s algebra grade was a "D."

T.H.'s grades were very poor during her sophomore year of school in 2008-09.  She received failing grades in geometry and biology,[2] as well as a "D" in English.  She also failed math, reading, and social studies on a high school graduation exam that she took in March of 2009.  Despite failing biology in school, she passed the science-biology portion of the March 2009 high school graduation exam.  During her sophomore year, despite her health problems, T.H. played on her high school volleyball team.

T.H. was frequently absent or tardy from school, or left school early.  During the 2008-09 school year, T.H. was tardy 21 times, absent 7 times, and Ms. H often checked T.H. out of school early.[3]  Pl.'s Ex. 29 at 1-3.  Some of these tardies, absences, and early check-outs were unexcused.  *Id.*  T.H. not only had unexcused tardies to her first class of the day, but also to classes in the middle and end of the day, after she was already at school.  *Id.*

_____

[2]T.H. later passed biology during summer school.

[3]Ms. H was threatened with a truancy action, but she testified that the truancy action was brought by the school by mistake, due to the school system marking T.H. down with unexcused absences and tardies an excessive number of times.  Tr. 1044:17 - 1046:13.

T.H. also had a poor attitude toward school.  A personal inventory conducted of T.H., prior to T.H.'s sophomore year, revealed that T.H. hates school.[4]  Board Exhibit (hereinafter "Bd.'s Ex.") 8 at 1.  T.H. "often would either not answer test questions or would not complete them.  On occasion [T.H.] would simply lay her head on the table where she sat and refuse to participate in class."  H.O.'s Dec. at 42.

### D.      Ms. H Pushes for T.H. to be Placed in Special Education

Ms. H often requested help for T.H. from MPS, because of T.H.'s poor grades.  Ms. H eventually obtained counsel in late May or early June 2009.  On June 2, 2009, Ms. H's lawyer mailed a request to MPS for an IDEA referral.  MPS then began collecting data on T.H.

MPS held an IDEA referral meeting on August 4, 2009.  At the referral meeting, the multi-disciplinary evaluation team determined that a referral for a special education evaluation was warranted.  Ms. H initially responded, according to the hearing officer, that "her child was not a special education student" and "did not want her daughter stigmatized by that label." H.O.'s Dec. at 11.  However, Ms. H later consented to the special education evaluation.

Testing began on August 6, 2009.  This testing included (1) observations of T.H. in the classroom; (2) behavior and attention deficit scales; (3) an IQ test; and (4) achievement tests.

---

[4]This personal inventory revealed that T.H. had a very negative attitude toward school, associating with others, and her family.  In this personal inventory: (1) in response to the prompt, "I do not like . . .," T.H. wrote: "people;" (2) in response to the prompt, "I would like to learn about . . .," T.H. wrote: "nothing;" (3) in response to the prompt, "I would be much better off if . . .," T.H. wrote: "people leave [sic] me alone;" (4) in response to the prompt, "[i]f I was allowed to help in class I would . . .," T.H. wrote: "i [sic] wouldnt [sic] help;" and (5) in response to the prompt, "[i]f I could change anything I would first . . .," T.H. wrote: "I would change my family."  Bd.'s Ex. 8 at 1.

Additionally, MPS asked if Ms. H would secure medical records that could be helpful in determining T.H.'s IDEA eligibility.

On September 8, 2009, a multi-disciplinary eligibility determination committee (the "Committee") met to determine whether T.H. was eligible for special education under IDEA. Specifically, they considered two IDEA disability categories: (1) Specific Learning Disability; and (2) Other Health Impaired.

The Committee analyzed a variety of data sources in determining whether T.H. qualified under either of those disability categories. The Committee considered T.H.'s § 504 plan, and noted that T.H. continued to do poorly in school despite her § 504 plan. The Committee also examined all of T.H.'s grades and work samples and noted her poor academic performance. The Committee noted that observations of T.H. revealed that T.H. engaged in "normal student behavior" and "work[ed] well with her peers." H.O.'s Dec. at 12. The Committee also was aware of T.H.'s low standardized testing scores and medical problems.

T.H.'s achievement testing[5] scores did not qualify T.H. as a child with a Specific Learning Disability. This achievement testing required that the school system first give T.H. an IQ test to determine T.H.'s predicted achievement score. To determine T.H.'s IQ score, a psychometrist for the school system administered the Wechsler Intelligence Scale for Children, which revealed a full-scale IQ of 90, and a predicted achievement score of 94. Subsequently, the psychometrist administered the Woodcock Johnson Achievement Test ("Woodcock Johnson") to determine T.H.'s achievement scores.

---

[5]This opinion will use the terms "achievement tests" and "severe discrepancy tests" interchangeably.

To be classified as having a Specific Learning Disability using achievement testing, a student must score 16 points lower than a predicted achievement score on either (1) a broad test category once; or (2) the same subtest score twice.  Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(i)(II).  This testing did not reveal that T.H. had a Specific Learning Disability.  Although T.H. scored at least 16 points lower than her predicted achievement score on two subtest categories of the Woodcock Johnson, her first test, subsequent testing of T.H. using the Wechsler Individual Achievement Test revealed no such discrepancy.

The Committee also used behavioral scales to evaluate T.H.  They used three Attention Deficit Disorder Evaluation Scales to determine whether T.H.'s ADHD caused her problems.  The three scales were completed by Ms. H, T.H.'s tenth grade biology teacher, and T.H.'s ninth grade history teacher.  None of these scales revealed clinically significant scores, but rather, merely showed that T.H. was "at risk."

The Committee also considered a Behavior Assessment System for Children scale, which measures whether behavior problems are affecting a child.  On this scale, T.H.'s composite scores were not clinically significant.  While T.H. received one clinically significant score, on "attention problems," the psychometrist explained that Alabama requires that the school system use a composite score to determine whether T.H. has behavioral problems, so this score did not qualify T.H. for special education.  Tr. at 714:13 - 715:5.

In sum, after considering all of this evidence, the Committee concluded that T.H. did not qualify for special education under the Specific Learning Disability or Other Health Impaired categories of IDEA.

8

**E.      Ms. H obtains an Independent Educational Evaluation from Promer**

On September 18, 2009, Ms. H obtained an independent educational evaluation in speech and language from Laura Promer ("Promer"), a speech and language therapist.  Prior to this evaluation, T.H. had not been evaluated for speech and language by MPS.  In fact, the zone resources coordinator for MPS noted that MPS had no reason to suspect a speech-language disability when it conducted its evaluation of T.H.  *See, e.g.*, H.O.'s Dec. at 19; Tr. 237:14-21.

Promer reviewed T.H.'s school records and conducted a variety of tests, including the Clinical Evaluation of Language Fundamentals, the Comprehensive Test of Phonological Processing, the Test of Reading Efficiency, the Gray Oral Reading Test, the Oral Written Language Scales, and the Test of Written Spelling.

Promer noted that T.H. took an excessive amount of time to complete the assessment, about twice as long as it should have taken.  Promer noted that T.H. was "sullen and dour" during the evaluation.  Promer gave T.H. extra time to answer the questions despite the fact that her test manual instructed her to move on to the next question rather than waiting for T.H. to answer.

The Clinical Evaluation of Language Fundamentals test indicated that T.H. was much better at expressive language than receptive language.  Promer opined that this indicated that "it was difficult for [T.H.] to take notes, to understand concepts, to understand teacher lectures and to comprehend any information that was provided to her orally," and this might evidence an auditory processing disorder.  H.O.'s Dec. at 17.  She also alternatively remarked that T.H. might have neurological issues.  Promer also noted that T.H. was a slow reader.

Promer also thought that T.H. might have a language disorder, because she had trouble manipulating sounds and words.

Promer concluded that T.H. needed "special education services because her deficits in receptive language do not allow her to understand instruction in the regular classroom."  H.O.'s Dec. at 18.


**F.      Ms. H Obtains an Independent Educational Evaluation from Goff**

On September 30, 2009, John Goff, a neuropsychologist, examined T.H. at the request of Ms. H.  Goff described T.H. as "sullen," with a "flat facial expression throughout much of the examination."  H.O.'s Dec. at 21.  Goff thought T.H. was "not particularly happy about being evaluated," though Goff believed "her effort throughout the evaluation was adequate."  H.O.'s Dec. at 21.

Goff began evaluating T.H. by considering her history.  Goff found significant the fact that T.H. had a seizure when T.H. was one year old, and wondered whether seizure activity was still continuing.

Goff also examined test results that were obtained in February 2009 by "Success Unlimited."  These showed that T.H. did poorly in math.  Goff examined Promer's evaluations that showed that T.H. had poor receptive language skills.

Goff also administered his own achievement test to T.H.  He first administered the Wechsler Adult Intelligence Scale to T.H.  T.H. scored a 75 IQ on this test, which was much lower than the score T.H. received when taking the Wechsler Intelligence Scale for Children that was previously administered by MPS.  Goff suggested that the reason for the difference was

because (1) he used an adult-based instead of child-based test when testing T.H., a child; and (2) T.H.'s efforts fluctuate on different days.

Goff's test results indicated that T.H. did poorly on math reasoning.  Specifically, T.H. scored a 74, placing her in the fifth grade range of performance.  Goff thus concluded, based on this test result and based on the fact that T.H. was failing math in school, that T.H. had a learning disability in math.  Goff admitted that T.H. did not meet the Alabama IDEA requirements for a Specific Learning Disability in math, and when asked whether he knew the requirements for a student to have a such a disability, he responded: "I do, but I don't care."  Tr. 1156:17-20.

Goff also noted that T.H. was scoring low in other areas on the achievement test.  T.H. scored at the beginning eighth level in "word reading," at the end of sixth grade level in "comprehension," and at the mid-third grade level in "pseudo word coding."  T.H. exhibited no weakness in written expression.

Goff also gave T.H. a Reitan-Indiana Apashia Screening Test.  This test revealed that T.H. read sentences at a fifth grade level, that she could not do simple math calculations mentally or on paper, and that she could not correctly place the minute hand on a drawing of a clock.

T.H. also took a computerized assessment called the Quotient ADHD diagnostic system to determine whether T.H. had attention problems.  These test results supported an ADHD diagnosis, and Goff opined that ADHD adversely affected T.H.'s ability to do school work.

Goff also conducted a Minnesota Multiphasic Personality Inventory - Adolescent.  This indicated that T.H. "engaged in strange behaviors and exhibited deviant symptoms" for someone

her age.  H.O.'s Dec. at 24.  Goff opined that T.H. was "impulsive and risk prone" and had a "mood disorder."  H.O.'s Dec. at 24.

Goff also critiqued MPS's behavioral scales testing on T.H., as well as the Behavior Assessment System for Children test performed by MPS.  Goff claimed that the school system did not "conduct a true evaluation," but rather "selected a random series of tests."  H.O.'s Dec. at 24.

**G.      Final Meeting with MPS**

On October 6, 2009, Ms. H requested to receive her independent educational evaluations at public expense.  The school system responded by proposing that it conduct its own speech/language of T.H., but Ms. H refused, because Promer already conducted a speech/language evaluation.  Nevertheless, MPS's speech language pathologist had several of T.H.'s teachers conduct a Clinical Evaluation of Language Fundamentals checklist.  These results indicated that T.H. was on par with T.H.'s peers in language skills.

**H.      The Due Process Hearing**

Ms. H. filed a due process complaint on October 8, 2009, challenging the eligibility determination made by MPS, and also demanding reimbursement for the independent educational evaluations conducted by Goff and Promer.  This due process complaint was consolidated with an earlier due process complaint filed by Ms. H alleging that MPS violated the "child-find" duties of the IDEA.  Subsequently, on October 29, 2009, MPS filed a due process complaint to have its evaluation of T.H. deemed adequate so it would not have to pay for those

obtained by Ms. H.  MPS's due process complaint was consolidated with the other two complaints.

The consolidated due process complaints required the hearing officer to determine three issues at a consolidated due process hearing: (1) whether MPS violated the "child-find" requirement of IDEA; (2) whether T.H. was incorrectly found ineligible for special education services due to having a Specific Learning Disability or Other Health Impairment; and (3) whether MPS had to reimburse Ms. H for the independent educational evaluations conducted by Goff and Promer.

First, the hearing officer concluded that MPS violated the child-find requirement of IDEA.  Neither party has appealed that decision to this court.  The hearing officer concluded that T.H. is "entitled to an auditory processing evaluation."  H.O.'s Dec. at 43.

Second, the hearing officer concluded that T.H. did not have a Specific Learning Disability or Other Health Impairment, and thus did not qualify for special education.  The hearing officer examined all of the previously-discussed evidence.  He also considered some minor irregularities and dealt with some objections to certain testing methods.  He examined both MPS's testing as well as the independent educational evaluations conducted by Goff and Promer.

Third, the hearing officer concluded that the evaluations conducted by MPS were appropriate, and accordingly, Ms. H could not be reimbursed by the school system for the independent educational evaluations conducted by Goff and Promer.

On June 9, 2010, Ms. H filed a Complaint in this court, appealing the second and third findings made by the hearing officer.

13

## IV.  DISCUSSION

There are three distinct issues that this court must decide.  First, the court must decide

whether T.H. was denied a Free Appropriate Public Education ("FAPE").  Ms. H alleges, and the

Board does not dispute, that if T.H. was a "child with a disability" as defined by IDEA, then she

was not receiving satisfactory care under IDEA, and thus was denied a FAPE.[6]  The parties

dispute, however, whether T.H. was a "child with a disability."  Under IDEA, a child qualifies to

receive special education if the child is a "child with a disability."  A child with a disability is

defined as a child (1) who has at least one of a list of statutory conditions, including Other

Health Impaired or Specific Learning Disability;[7] and (2) "who, by reason thereof, needs special

education and related services."  20 U.S.C. § 1401(3)(A).  Whether a child qualifies as a "child

with a disability . . . poses a mixed legal and factual inquiry."  *Mr. I. ex rel. L.I. v. Me. Sch.*

*Admin. Dist. No. 55*, 480 F.3d 1, 10 (1st Cir. 2007) (citing *J.D. ex rel. J.D. v. Pawlet Sch. Dist.*,

224 F.3d 60, 64 (2d Cir. 2000); *Yankton Sch. Dist. v. Schramm*, 93 F.3d 1369, 1374 (8th Cir.

1996)).

This court first must determine whether the hearing officer properly concluded that T.H.

did not have a (1) Specific Learning Disability; or (2) Other Health Impairment.  If the court

finds that T.H. fits either of these definitions, then T.H. is a "child with a disability" as defined

by IDEA, and the court must conclude that T.H. was denied a FAPE.[8]

---

[6]For example, T.H.'s teachers never developed an individualized educational plan
("IEP") for T.H., which is the hallmark of what IDEA requires for a child with a disability.

[7]The other statutory conditions are not at issue on summary judgment.

[8]This case differs from a common type of IDEA case appealed to the district courts, in
which the child has already been designated as a special education student and the issue is
whether the child has been provided a FAPE.  In those cases, unlike here, courts "ask whether:

Second, the court must determine whether T.H. is entitled to receive reimbursement for the independent educational evaluations conducted by Goff and Promer.

Third, the court must determine whether the Board can raise any objection to the hearing officer's determination on the issue of child-find at this stage in the proceedings.

The court concludes that the Board is due to prevail on the first and second issues, and Ms. H is due to prevail on the third issue.

**A.     Child with a Disability**

1.     *Specific Learning Disability*

Ms. H argues that the hearing officer incorrectly determined that T.H. did not have a Specific Learning Disability.

Alabama's IDEA regulations define Specific Learning Disability as:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Specific learning disability does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage.

Ala. Admin. Code r. 290-8-9-.03(10)(a).

Alabama's IDEA regulations require that a child must meet six criteria prior to being classified as having a Specific Learning Disability.  Ala. Admin. Code r. 290-8-9-.03(10)(c).

---

(1) the school complied with the IDEA's procedures; and (2) the IEP developed through those procedures is reasonably calculated to enable the student to receive educational benefits. *Loren F.*, 349 F.3d at 1312.  The issue in this case is whether T.H. is eligible to receive special education at all.

Five of these criteria are indisputedly met by T.H. in this case, whereas one is disputed.[9]  The

disputed criterion includes three elements, and its text reads:

> (c) Criteria . . . .
>
> 2. A public agency may determine that a child has a specific learning disability if:
>
> (i) The child does not achieve adequately for the child's age or meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade level standards: oral expression, listening comprehension, written expression, basic reading skills, reading fluency skills, reading comprehension, mathematics calculation, or mathematics problem solving.
>
> (ii) The child does not make sufficient progress to meet age or State-approved grade-level standards in one or more of the areas identified in paragraph 2.(i) of this section when using a process based on the child's response to scientific, research-based intervention; or
>
> (iii) The child exhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments.

Ala. Admin. Code r. 290-8-9-.03(10)(c)(2).  MPS concluded that none of these three elements

was met, and the hearing officer agreed.


            i.        Single Measure or Assessment

Ms. H first argues that the hearing officer's determination was erroneous because it

focused only on a "severe discrepancy" calculation.  Ms. H argues that IDEA prohibits a school

system from making an eligibility determination solely on the basis of the "severe discrepancy"

calculation.

---

[9] The full list of criteria are set out in Ala. Admin. Code r. 290-8-9-.03(10)(c).

The court first notes that Ms. H's argument does not address the actual issue before the court: whether T.H. has a Specific Learning Disability.  The court is to review the hearing officer's judgment *de novo* and make a judgment on the record as to whether this court concludes that T.H. has a Specific Learning Disability.  *See, e.g.*, *Mr. I.*, 480 F.3d at 10.  Thus, a legal error by the hearing officer will not compel a judgment in Ms. H's favor.  However, Ms. H's argument is significant, because the court must properly apply the law in this case regardless of whether the hearing officer did.

Ms. H asserts that federal IDEA regulations require school districts to not rely solely on a single "measure or assessment" when determining whether a child has a Specific Learning Disability, and that, in this case, "it is clear that MPS based its denial of eligibility solely on the severe discrepancy calculation."  (Doc. #28 at 66.)

As Ms. H asserts, federal IDEA regulations prohibit the use of "any single measure or assessment as the sole criterion for determining whether a child is a child with a disability."  34 C.F.R. § 300.304(b)(2); *accord* Ala. Admin. Code r. 290-8-9-.02(h).  Instead, in performing a disability evaluation, a school system must use "a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining whether the child is a child with a disability."  Ala. Admin. Code r. 290-8-9-.02(l); *accord* 34 C.F.R. § 300.304(b)(1)(i).

Although no courts within the Eleventh Circuit have addressed this issue, courts in other jurisdictions have.  For example, in *E.M. v. Pajaro Valley Unified School District*, the Northern District of California noted that if a hearing officer "considered only the [Wechsler Intelligence Scale for Children test] score as the dispositive indicator of eligibility . . . to the exclusion of

17

other test scores and qualitative indicators such as report card comments and anecdotal testimony provided by [the child's] teachers . . . it would violate the statutory" prohibition on using a single "measure or assessment" as the sole criterion for determining IDEA eligibility.  No. C 06-4694 JF, 2009 WL 2766704, at *14 (N.D. Cal. Aug. 27, 2009).  However, the district court found that this statutory requirement was not violated because (1) the hearing officer "acknowledged that the use of only a single measure . . . is not permitted;" (2) the hearing officer noted that the school system used three different test results, "the K-ABC, the WISC-III, and the TONI," to determine the child's intellectual ability; and (3) the school system had administered "multiple tests" to the child, and "used the totality of those results" to determine eligibility.  *Id.*

*Nguyen v. District of Columbia*, a case from the D.C. District Court, though not specifically dealing with the "single measure or assessment" rule, is consistent with *E.M.*  In *Nguyen*, the D.C. District Court reasoned that a hearing officer's determination that a child did not have a Specific Learning Disability was affirmed based on a consideration of (1) severe discrepancy testing; (2) comments about the child by one of the child's teachers; (3) a diagnosis of a "general learning disorder" by a doctor; and (4) the child's poor attendance record.  681 F. Supp. 2d at 52.

In this case, the hearing officer's reasoning with respect to whether T.H. has a Specific Learning Disability is admittedly difficult to follow.  Nevertheless, the hearing officer appeared to properly consider more than just a severe discrepancy calculation in determining that T.H. did not have a Specific Learning Disability.  First, upon commencing discussion of whether T.H. had a Specific Learning Disability, the hearing officer acknowledged that "no single criterion or specific number of characteristics can be used to identify children with specific learning

18

disabilities." H.O.'s Dec. at 32.[10]  Second, the hearing officer noted that a behavioral scale was

administered to T.H. "to eliminate emotional disturbance as the potential cause of the disability

category of specific learning disability." H.O.'s Dec. at 33.  Third, the hearing officer noted that

the child was observed in her regular education classroom by an inclusion teacher.  H.O.'s Dec.

at 33.[11]  Fourth, the hearing officer discussed the results and asserted criticisms of T.H.'s severe

discrepancy testing.  H.O.'s Dec. at 33-34.  Fifth, the hearing officer noted that Promer, the

speech language pathologist who conducted an independent educational evaluation on T.H.,

described T.H.'s "expressive language skills" as "one of the child's strengths." H.O.'s Dec. at

34.  Sixth, the hearing officer considered the fact that T.H. failed her tenth grade math course,

but dismissed that based on T.H.'s Woodcock Johnson score.  H.O.'s Dec. at 34.  Seventh, the

hearing officer noted, when discussing the factual background of the case, the results of the

testing by Promer and Goff.  H.O.'s Dec. 19-24.[12]

---

[10]The hearing officer supported (1) this proposition; as well as the proposition that (2)
"the age-appropriateness of observed behaviors and the frequency, intensity, and duration of a
child's learning problems are critical in distinguishing specific learning disabilities from learning
problems resulting from such factors such as low motivation, underachievement, or inadequate
instruction" by citing to Ala. Admin. Code r. 290-8-9-.03(10)(f)(2).  This citation is erroneous,
as this provision only applies to "children referred prior to July 1, 1998."  However, this is
harmless legal error.  First, as previously discussed, the first proposition is supported by Ala.
Admin. Code r. 290-8-9-.02(h).  Second, the second proposition merely explains two of the
sources of information that a school, hearing officer, or court might consider in determining
whether a child has a Specific Learning Disability, and thus finds support in Ala. Admin. Code r.
290-8-9-.02(l).

[11]The hearing officer explained that this observation was not technically proper because
the teacher was "not a member of the [Committee] team as required by pertinent federal
regulations."  H.O.'s Dec. at 33 (citing 34 C.F.R. §§ 300.306(a)(1), 300.310(a)(2)).
Nevertheless, the hearing officer considered this observation to the extent that it showed that
T.H. was "attentive and working well with her fellow students."  H.O.'s Dec. at 33.

[12]The hearing officer did not discuss these evaluations in the "Discussion of Issues"
portion of the decision.  Nevertheless, the court concludes that he did consider these evaluations.

In short, the hearing officer considered more than just a "single measure or assessment" in determining that T.H. did not have a Specific Learning Disability. The hearing officer discussed a number of different sources of evidence in making that determination. Although the hearing officer's opinion did not explicitly state that it considered each of these factors, the hearing officer took the time to explain each of these while determining whether T.H. had a Specific Learning Disability and did not explicitly state that he was not going to consider any particular factor. Additionally, the court finds unpersuasive Ms. H's conclusory statement that "the [hearing officer] does not address [the single measurement or assessment problem], with limited exception. Rather, the [hearing officer] appears to accept that MPS [sic] complete reliance on the results of the significant discrepancy calculation was appropriate." (Doc. #28 at 68.) Accordingly, the court concludes that the hearing officer met the requirement of relying on more than a "single measure or assessment."[13]

---

The hearing officer described the independent educational evaluations in detail, explaining parts that both favored and disfavored Ms. H's position. Additionally, the hearing officer never stated that he refused to consider these evaluations in his decision.

[13]Moreover, MPS conducted its examination of T.H. adequately. Ms. H presented testimony from Carolyn Stinson, MPS's psychometrist, whom Ms. H alleges testified that MPS only considered the severe discrepancy calculation in evaluating T.H. *See, e.g.*, (Doc. #28 at 63-66). However, a consideration of the evidence shows that MPS considered more than just severe discrepancy scores. For example, as previously discussed, MPS examined T.H.'s work product and observed T.H. in the classroom. In fact, Stinson testified that MPS considered more than simply the severe discrepancy calculation. She testified that MPS considered, in addition to the severe discrepancy calculation: (1) school records; (2) grades; (3) work samples; (4) vision and hearing screening; (5) behavior scales; (6) an environmental economic concern check sheet; and (7) whether a student's teachers are highly qualified. Tr. 774:21 - 775:23.

    ii.  *Evaluating Whether T.H. Has a Specific Learning Disability*

   The remaining issue is the merits: whether T.H. has a Specific Learning Disability.  After reviewing the relevant evidence in the record in this case, the court concludes that it agrees with the hearing officer's determination that T.H. did not.  The court will discuss the relevant categories of evidence in turn.

    a.  Achievement Testing Conducted by MPS

   The achievement testing scores obtained by MPS indicate that T.H. does not have a Specific Learning Disability.  Neither party currently[14] argues that the tests did not comply with Alabama and federal IDEA regulations.  The scores indicated that T.H. did not have a severe discrepancy as defined by Alabama IDEA regulations.  In fact, pursuant to Alabama IDEA regulations, T.H. was tested twice in two subtest areas where she showed weakness, yet T.H. did not score low enough on the retest to be classified as having a Specific Learning Disability.  On the other hand, T.H. did not receive excellent scores on these tests.

   Ms. H argues that these scores showed that T.H. had a Specific Learning Disability.  Ms. H argues that the Woodcock Johnson scores showed that T.H. was "not achieving adequately for her age in numerous areas, including listening comprehension[, which is an eligibility criterion], which placed T.H. at the 6.6 grade in this area."  (Doc. #28 at 68.)  Ms. H asserts that these scores provide the required "documentation of a pattern of strengths and weaknesses in performance relative to age and State-approved grade level standards."  (Doc. #28 at 68.)

---

   [14]The parties disputed the validity of these tests during the pendency of the due process hearing.  However, these disputes have not been raised in the instant case.

(quoting 34 C.F.R. § 300.309(a)(2); Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(iii)).  However, the full text of what Ms. H is quoting states that a child can be found to have a Specific Learning Disability if that child exhibits a "pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development, that is determined by the group to be relevant to the identification of a specific learning disability, using appropriate assessments."  Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(iii).  This is a fact-intensive inquiry.  Ms. H does not address how this alleged pattern of strengths and weaknesses is "determined by the group to be relevant to the identification of a specific learning disability."  She does not cite evidence or make argument that clearly indicates that this requirement has been met.

In sum, the achievement testing scores provide some, but not conclusive, evidence that T.H. did not have a Specific Learning Disability.

### b.    Poor Grades

T.H.'s poor grades suggest that T.H. has a Specific Learning Disability, but the persuasive effect of T.H.'s grades is weaker after considering T.H.'s poor attendance and attitude.  The hearing officer noted that "[t]hroughout [T.H.'s] school career she has been average or below average in her academic grades as well as in her standardized testing.  Her grades have declined each year that she has attended school."  H.O.'s Dec. at 6.  The hearing officer acknowledged that there was suspicion that T.H.'s "junior high grades were altered by school system personnel to cause it to appear that [T.H.] performed better than she actually did."  H.O.'s Dec. at 6.  During her freshman year, T.H. received "average scores in all subjects except

[she received a D] in algebra."  H.O.'s Dec. at 8.  During T.H.'s sophomore year, she had failing

grades in geometry and biology and a D in English.  H.O.'s Dec. at 7.  She also failed math,

reading, and social studies on her high school graduation exam.  H.O.'s Dec. at 7.

Yet the evidence of low grades leans in Ms. H's favor in this case only to the extent that

the low grades may have been caused by a Specific Learning Disability.  In this case, the hearing

officer found two reasons to believe that the low grades were caused by something else.

The first reason is T.H.'s attendance problem.  T.H. has frequently been absent from class

or tardy.  Specifically, during T.H.'s 2008-09 sophomore year, T.H. was tardy 21 times, absent 7

times, and often was checked out early from school by Ms. H.  Pl.'s Ex. 29 at 1-3.  Some of these

tardies, absences, and early check-outs were unexcused.  Pl.'s Ex. 29 at 1-3.  *See also Nguyen*,

681 F. Supp. 2d at 52 (considering a child's "poor attendance" as one reason for why that child's

poor grades were not the result of a Specific Learning Disability).  Although T.H. has medical

issues that might be the cause of her poor attendance, *see infra*, these medical issues are not

mental issues, but physical, and thus absences due to these issues do not go to whether T.H. has a

Specific Learning Disability.

The second reason is T.H.'s attitude problems.  The hearing officer noted that "[a]lthough

it was unclear why [T.H.'s] grades fell as they did . . . the decline must [sic] attributed at least in

part to [T.H.'s] deteriorating attitude."  H.O.'s Dec. at 42.  For example, T.H. "often would

either not answer test questions or would not complete them.  On occasion [T.H.] would simply

lay her head on the table where she sat and refuse to participate in class."  H.O.'s Dec. at 42.

During private counseling, T.H. indicated that she was "overwhelmed by school work but

despite that fact her mother continued to push her to do better . . . . [she] resented the situation

23

[and] it caused frequent arguments between her mother and her." H.O.'s Dec. at 8; Tr. 598:3-15. A personal inventory conducted of T.H. showed that T.H. "hate[d] school," and had a negative attitude toward learning and associating with others. Bd.'s Ex. 8 at 1.

Ms. H also argues that "T.H. received numerous arguably research-based interventions as part of her § 504 plan and yet still struggled academically, [and] MPS also had documentation that T.H. was not making sufficient progress to meet State approved grade-level standards based on the response to intervention method of data evaluation." (Doc. #28 at 69.) (citing 34 C.F.R. § 300.309(a)(2)(I); Ala. Admin. Code r. § 290-8-9-.03(10)(d)(2)(ii)). The Alabama IDEA regulation to which Ms. H is referring states in full that a child can be found to have a Specific Learning Disability if "[t]he child does not make sufficient progress to meet age or State-approved grade-level standards in one or more [specified areas] when using a process based on the child's response to scientific, research-based intervention." Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(ii). Once again, this is a fact-intensive inquiry, so this court is inclined to defer to the hearing officer unless the court is satisfied by Ms. H that the hearing officer is wrong. Ms. H's brief is insufficient to show that, because, among other concerns, it (1) does not explain exactly what research-based intervention occurred, other than generally referring to "*arguably* research-based [§ 504] interventions;" and (2) does not explain what process was used. The argument she has given is not specific enough to show the court just where the hearing officer was wrong. Ms. H virtually concedes this argument by using the word "arguably" before "research-based interventions."

In sum, T.H.'s low and declining grades provide some evidence that T.H. has a Specific Learning Disability.  However, the weight of that evidence is reduced by the factors discussed above.

### c.     Goff's Independent Educational Evaluation

The independent educational evaluation conducted by Goff, though providing some evidence that T.H. might have a Specific Learning Disability, is too problematic to offer much persuasive value as to the issue.

First, Goff's purported severe discrepancy test does not diminish the persuasiveness of MPS's achievement testing.  Goff began the test by testing T.H. using the Wechsler *Adult* Intelligence Scale, not the Wechsler Intelligence Scale for children, thus violating the IDEA requirement that testing be age-specific.  Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(i)(I) ("An *age-appropriate* norm-referenced individually administered intelligence test . . . ") (emphasis added).  Additionally, Goff's definition of severe discrepancy differs from the definition used in IDEA regulations: Goff determined that a severe discrepancy existed because T.H.'s "numerical operations" score was much higher than her "math reasoning score."  However, a severe discrepancy is calculated on the basis of discrepancy from the tested child's predicted achievement score.[15]  Ala. Admin. Code r. 290-8-9-.03(10)(d)(2)(I) ("Obtained achievement scores must be greater than one standard deviation unit or at least 16 points below the predicted

---

[15]Goff admitted that T.H. did not meet the Alabama IDEA requirements for a Specific Learning Disability in math, and when asked whether he knew the requirements for a student to have a Specific Learning Disability in math, he responded: "I do, but I don't care."  Tr. 1156:17-20.

achievement score using instruments with a common metric . . .").  Using the correct standard, the predicted achievement score from Goff's test did not indicate a severe discrepancy.

Second, though Goff asserted that T.H. had a Specific Learning Disability in mathematics, his reasons for her having such a disorder included "difficulties with attention and concentration" and "her moods."  1157:21.  Difficulties with attention and concentration go more to whether a child has an Other Health Impairment than a Specific Learning Disability.[16]  Additionally, Goff's mention of "moods" is consistent with the notion that T.H.'s performance problems in school were not caused by a Specific Learning Disability, but because of T.H.'s attitude problems.

d.    Promer's Independent Educational Evaluation

While Promer's independent educational evaluation provides some evidence that T.H. had a Specific Learning Disability, it does not, contrary to Ms. H's assertion, establish a severe discrepancy.  (Doc. #28 at 70-71.)

First, Ms. H notes, as she does when discussing Goff's independent educational evaluation, that "Promer's evaluation of T.H. produced achievement scores which were significantly discrepant from her I.Q. score."  (Doc. #28 at 70-71.)  However, Ms. H points to no

---

[16]For example, Specific Learning Disability is defined as "disorder in one or more of the basic psychological processes involved in understanding or in using language."  Ala. Admin. Code r. 290-8-9.03(10)(a).  By contrast, the definition of Other Health Impaired specifically refers to difficulties in attention and concentration, such as "a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems such as . . . [ADD or ADHD]."  Ala. Admin. Code r. 290-8-9-.03(9)(a).

evidence to support her assertion that the severe discrepancy calculation, discussed above, was actually satisfied.

The court acknowledges that the results of these tests provide some evidence that T.H. had a Specific Learning Disability.  However, these tests do not establish a severe discrepancy under the administrative definition of that term, nor do they satisfy any of the other methods of proving that a child has a Specific Learning Disability.

e.      Conclusion

As previously stated, the determination of whether a child has a disability under IDEA is a mixed factual and legal inquiry.  Additionally, a district court will review an appeal of an IDEA due process hearing *de novo* as to all legal judgments, but has discretion to give deference to the hearing officer's factual determinations.  Here, the hearing officer did not make any legal errors.

Whether T.H. has a Specific Learning Disability is a close question.  The fact that this is a close question favors the Board.  The burden of persuading the court that the hearing officer is wrong in his factual findings is on the party who lost at the due process hearing.  Based on these factual determinations, and on an independent review of the evidence, the court applies the facts to the law and agrees with the hearing officer's determination that T.H. does not have a Specific

Learning Disability.[17]  Accordingly, the court finds that T.H. was not erroneously denied a FAPE

on that basis.


     2.     *Other Health Impairment*

     Ms. H also argues that the hearing officer incorrectly determined that T.H. was not a

child with a disability under the category of Other Health Impaired.

     Under IDEA, a child with a disability under the Other Health Impaired category is

defined as a child (1) who has an Other Health Impairment; and (2) "who, by reason thereof,

needs special education and related services."  20 U.S.C. § 1401(3)(A).  The issue in dispute in

this case is the first prong of this test.

> Under the Alabama IDEA regulations, Other Health Impaired
>
> means having limited strength, vitality or alertness, including a heightened
> alertness to environmental stimuli, that *results in limited alertness with respect to
> the educational environment*, that is *due to chronic or acute health problems* such
> as asthma, attention deficit disorder or attention deficit hyperactivity disorder . . . .
> If a medical diagnosis is presented, the *medical diagnosis alone is not enough* to
> justify being identified in the area of other health impairment.  The impairment
> *must adversely affect the educational performance* of the child.

Ala. Admin. Code r. 290-8-9-.03(9)(a) (emphasis added); *accord* 34 C.F.R. § 300.8(c)(9).

     Alabama's IDEA regulations set forth criteria that must be used to evaluate whether a

child has an Other Health Impairment.  Under Alabama's regulations, a child can qualify as

---

     [17]The hearing officer ordered the school system to give T.H. an auditory processing
evaluation to determine the existence or extent of any language processing defects.  H.O.'s Dec.
at 43.  This will address one of Ms. H's key points raised in this case, and one of the key
problems that Promer found: that T.H. has language comprehension problems.

Other Health Impaired based on (1) general health impairments; or (2) based solely on

ADD/ADHD.  To qualify based on general health impairments, the child must meet four criteria:

> 1. Evidence that vision/hearing screening results are satisfactory prior to proceeding with evaluations.

> 2. Evidence of a health impairment.

> 3. Performance measures that document how the child's disability affects his or her involvement and progress in the general education curriculum, or for preschool children, how the disability affects the child's participation in age-appropriate activities.

> 4. A statement providing evidence that the health impairment adversely affects the educational performance of the child and, for initial evaluation for special education services only evidence of interventions/accommodations that have been tried in regular education class(es) or the natural environment (for preschool children) but were deemed unsuccessful.

Ala. Admin. Code r. 290-8-9-.03(9)(b).  By contrast, to qualify as Other Health Impaired due

solely to ADD/ADHD, a child must meet the following four criteria:

> 1. Evidence that vision/hearing screening results are satisfactory prior to proceeding with evaluations.

> 2. Evidence that the health impairment adversely affects the educational performance of the child.

> 3. Standard scores (total or composite) on two out of three of the same norm-referenced scale designed specifically to determine the presence of ADD or ADHD must be at least two standard deviations above or below the mean (70, depending on the rating scale). Ratings from three or more scales must be obtained from at least three independent raters, one of whom may be the parent.

> 4. For initial evaluations only, evidence of interventions/accommodations that have been tried in regular education class(s) or the natural environment (for preschool children) but were deemed unsuccessful.

Ala. Admin. Code r. 290-8-9-.03(9)(d).

In this case, T.H. allegedly suffers from both ADHD as well as other health problems. However, Ms. H concedes in brief that, "[f]or purposes of this appeal, Plaintiffs rely on the first portion of the rule, which relates to T.H.'s health conditions," as opposed to ADD/ADHD.  (Doc. #28 at 42.)  Accordingly, the court's subsequent analysis of whether T.H. qualifies as Other Health Impaired will involve consideration of only the first set of criteria.

However, Ms. H's reliance on the general criteria for Other Health Impairment does not mean that T.H.'s ADHD is irrelevant.  Rather, T.H.'s ADHD is part of the totality of the circumstances analysis necessary to consider whether T.H. qualifies under the general criteria for Other Health Impaired.

i.      Criterion 1: Vision/Hearing Screening Results

In this case, neither party disputes that T.H. had satisfactory vision/hearing screening results.

ii.      Criterion 2: Evidence of a Health Impairment

The second criterion for determining whether a child has an Other Health Impairment is "[e]vidence of a health impairment."  Ala. Admin. Code r. 290-8-9-.03(9)(c)(2) further elaborates that the minimum evaluative component for this criterion is "[d]ocumentation of the health impairment (medical diagnosis/statement)."

Ms. H asserts that this criterion is met because "MPS were [sic] in possession of T.H.'s § 504 plans which stated that T.H. had been diagnosed with ADHD, urinary problems, and heart

problems." (Doc. #28 at 43.)  Significantly, the hearing officer never found the evidence of

T.H.'s health problems to be insufficient under this criterion.

The Board does not appear to seriously dispute this point.  The Board briefly argues that

the documentation of T.H.'s health problems is insufficient, because T.H.'s ADD scales revealed

no clinically significant scores and the Behavior Assessment System For Children test revealed

no clinically significant problems.  However, even if the Board is correct, T.H.'s § 504 plans

provided sufficient documentation to satisfy this criterion.  The Board's remaining argument

complains that MPS did not receive medical records from Ms. H despite requesting those

medical records, but makes no legal argument that the records it had were insufficient.

Accordingly, the court agrees with the hearing officer that this criterion is met.


iii.     Criterion 3: Performance Measures

The third criterion is "[p]erformance measures that document how the child's disability

affects his or her involvement and progress in the general education curriculum."  Ala. Admin.

Code r. 290-8-9-.03(9)(b)(3).  Alabama's IDEA regulations describe the minimum evaluative

components for this criterion as including "developmental scores, individual and/or group

intelligence scores, individual and/or group education achievement and/or diagnostic test(s)

scores, classroom observations, motor assessments, criterion-referenced tests, curriculum-based

assessments, review of child's existing records, (i.e. attendance, health)."  Ala. Admin. Code r.

290-8-9-.03(9)(c)(3).

In this case, Ms. H alleges that she met this criterion because "T.H. had numerous

absences due to her health conditions and that she performed very poorly on certain standardized

achievement tests."  (Doc. #28 at 44.)  Ms. H claims this is documented because "[d]uring the [Committee] meeting, T.H.'s attendance was discussed and T.H.'s teachers felt her progress was hindered by her attendance difficulties . . . . [and] Ms. H explained that any absences were directly related to T.H.'s health impairments . . . . Thus, [MPS] was in possession of several performance measures documenting that T.H.'s disabilities affect her involvement in the general education curriculum."  (Doc. #28 at 44-45.)

The Board does not appear to dispute Ms. H's argument.  Additionally, the hearing officer did not rule against Ms. H on the basis of this criterion.

This criterion requires performance measures documenting how (1) T.H.'s disability (2) "affects [her] . . . involvement and progress" in education.  MPS's review of T.H.'s attendance records and § 504 records, combined with discussing this issue with Ms. H, provided sufficient performance records to satisfy this criterion.


iv.     Criterion 4: Causation

The last criterion requires "[a] statement providing evidence that *the health impairment adversely affects the educational performance* of the child and, for initial evaluation for special education services only, *evidence of interventions/accommodations that have been* tried in regular education class(es) . . . *but were deemed unsuccessful*."  Ala. Admin. Code r. 290-8-9-.03(9)(b)(3) (emphasis added).  In this case, this criterion involves two different questions that are both central to the IDEA eligibility question: (1) whether the child's health impairment *adversely affects* educational performance; and (2) whether the child *needs* special education to

32

deal with the adverse effect on educational performance, or whether some other method could solve the problem. *See Marshall Joint Sch. Dist. No. 2*, 616 F.3d at 638.

Here, the Committee and the hearing officer both apparently based their decisions that T.H. did not have an Other Health Impairment on the first question: that T.H.'s health impairments did not adversely affect T.H.'s educational performance. H.O.'s Dec. at 42 ("[I]t did not appear . . . that [T.H.'s] . . . medical conditions adversely affected her educational performance."). This is the only question in dispute here. The hearing officer noted that:

> While Petitioner experienced physical ailments, she was able to engage in athletic events and a normal social life. Although it was unclear why her grades fell as they did in the tenth grade, it could be that the decline must be attributed at least in part to Petitioner's deteriorating attitude, her disinterest in her classes, her conflicts with her parents and her participation in outside activities. For example, Petitioner's biology teacher said the child often would either not answer test questions or would not complete them. On occasion the child would simply lay her head on the table where she sat and refuse to participate in class. The child was also upset that her mother did not approve of her friends including one of her § 504 peer tutors. Any of those circumstances - alone or in combination - could explain Petitioner's failing grades. At any rate, it cannot be said that the [Committee] team's conclusion on September 8, 2009 that the child was not eligible for special education services was incorrect or not supported by the evidence reviewed by the team.

H.O.'s Dec. at 42.

Ms. H first argues that T.H. must be found to have met this requirement because of T.H.'s § 504 plans. Ms. H notes that, to be eligible under § 504, a student must have a health condition which *substantially limits* a major life activity. (Doc. #28 at 45.) Ms. H asserts that, to be classified as having an Other Health Impairment, a child only need have a condition that has an *adverse effect* of the student's educational performance. According to the First Circuit, "adversely affects" only requires any adverse effect; there is no requirement of substantiality. *Mr. I.*, 480 F.3d at 33. Ms. H claims, based on this definition of adverse effect, that T.H. must

33

necessarily qualify as Other Health Impaired because, when T.H. was found eligible for § 504 services, T.H. was classified as being "substantially limited in the major life activity of learning." (Doc. #28 at 45-46.)[18]

The Board agrees that MPS "previously determined that" T.H. had disabilities substantially limiting her in the major life activity of learning under § 504. (Doc. #32 at 31.) However, the Board argues that § 504's requirements do not mirror those of the IDEA or Alabama's IDEA regulations. Specifically, the Board notes that a child can qualify for § 504 services by having a "record of impairment," whereas a record of impairment is insufficient to qualify for services under IDEA. (Doc. #32 at 31-32) (citing *Letter to Brumbaugh*, 50 IDELR 107 (Jan. 15, 2008), *available at* http://www2.ed.gov/policy/speced/guid/idea/letters/2008-1/brumbaugh010508disability1q2008.pdf ("[T]he child's *current* need for special education and related services is the relevant consideration.") (emphasis added). In other words, present impairment is necessary to satisfy IDEA's eligibility requirements.

The Board's argument is supported by the language of Ala. Admin. Code r. 290-8-9-.03(9)(b)(3), which requires, in the present tense, that the health impairment at issue "adversely *affect*" educational performance. Therefore, the court agrees with the Board: T.H. is not eligible under IDEA merely because T.H. was, in the past, found to be covered by § 504. Rather, Ms. H

---

[18]Ms. H also argues that this criterion is met because T.H.'s "Referral for [an IDEA] Evaluation" form stated that T.H. had several health conditions that impacted her educational performance. (Doc. #28 at 50.) However, this form cannot be treated as definitive. The form itself was used to obtain an evaluation for T.H. If the form itself were definitive, there would be no reason for an evaluation, because the form would invariably establish that a child had a disability under IDEA.

must show that T.H. is *currently eligible* to be covered by IDEA.  Past § 504 plans are relevant, but not dispositive, of eligibility under IDEA.

Moreover, the health impairment must actually, not merely theoretically, affect educational performance.  *See Marshall Joint Sch. Dist. No. 2*, 616 F.3d at 637 (holding, while interpreting state IDEA language identical to the federal IDEA standards, that to satisfy the "adversely affects" standard, "[i]t is not whether something, when considered in the abstract, can adversely affect a student's educational performance, but whether in reality it does").[19]

Thus, the question in this case becomes one of fact: whether T.H.'s urinary and heart problems, combined with her ADHD, *actually* adversely affect her educational performance.  This is a question of causation.  On the one hand, Ms. H asserts that T.H.'s urinary and heart problems cause her absences, tardies, and early dismissals from school.  (Doc. #28 at 45-47.)  Ms. H further asserts that lack of school attendance could have a negative effect on T.H.'s academic performance.  (Doc. #28 at 45-47.)  Ms. H contends that "[b]oth Ms. H and T.H.'s teachers agreed that T.H.'s absences due to her health impairments were affecting her performance in the classroom."  (Doc. #28 at 46.)

On the other hand, some of T.H.'s absences, tardies, and early dismissals in tenth grade were unexcused. Pl.'s Ex. 29 at 1-3.  The court need not assume that the unexcused absences and

---

[19]Ms. H writes that the Seventh Circuit in *Marshall* did not actually define the term "adversely affects" because the court wrote that "we express no opinion on how that term should be defined."  *Marshall*, 616 F.3d at 637 n.3.  However, the court later specifically held that the ALJ applied the wrong legal standard in evaluating whether an impairment adversely affected a student's educational performance, and that the issue in adverse effect is "not whether something can adversely affect . . . but whether in reality it does."  *Id.* at 637.

These two statements are not inconsistent.  The *Marshall* court was not "defining" the term "adversely affects."  Rather, it was simply stating that the text of the IDEA does not authorize hypothetical consideration of adverse effect.

tardies had anything to do with T.H.'s medical conditions.  Significantly, T.H. was tardy not only to her first class of the day, but also to later classes.  Pl.'s Ex. 29 at 1-2.  While Ms. H testified that the tardies that occurred at the beginning of the day should have been excused due to excuse notes that Ms. H gave the school, Ms. H could not explain the unexcused tardies that T.H. accrued in the middle and end of the school day, other than noting that T.H. "might be a little late because she can walk a little slow."  Tr. 1050:20-23.  In fact, the hearing officer implicitly questioned whether T.H.'s attendance issues were entirely caused by health problems by noting that T.H. played on her high school volleyball team.  Most significantly, the hearing officer considered all of the above facts but rejected that they meant T.H.'s health conditions adversely affected her educational performance.  Instead, the hearing officer emphasized that T.H. had a "deteriorating attitude . . . disinterest in her classes . . . conflicts with her parents and . . . participation in outside activities" that also could have caused T.H.'s low grades.  H.O.'s Dec. at 42.

Moreover, to the extent T.H. is affected by ADHD, these effects are clinically insignificant.  As the Board notes, the ADD scales showed that T.H.'s behavior was not clinically significant, and the Behavior Assessment for Children test did not reveal that T.H. had any clinically significant behavior problems.

In sum, the evidence before the court shows that T.H.'s academic performance is poor, and this poor academic performance might be caused by many factors, one of these factors being lack of attendance at school caused by T.H.'s health conditions, or by T.H.'s ADHD.  The court notes that T.H.'s IDEA evaluators have expertise in factual questions relating to academic performance, and this court does not.  T.H.'s IDEA evaluators concluded that T.H.'s health

36

conditions did not cause T.H.'s lower grades, and the hearing officer agreed.  Although

theoretically, the court could find it reasonable for the hearing officer to have found that T.H.'s

health conditions adversely affected T.H.'s educational performance, the court also finds it

reasonable for the hearing officer to determine that the health conditions had no such adverse

effect.  In the end, the court is not persuaded that the hearing officer was wrong on this fact-

sensitive issue, and will not overturn the hearing officer's decision.


              v.        Conclusion

The court accepts the hearing officer's findings of fact, agrees with his application of

those facts to the law, and finds that T.H. did not have an Other Health Impairment.

Accordingly, the Board did not erroneously deny T.H. a FAPE by failing to provide T.H. special

education on the basis of an Other Health Impairment.


**B.**      **Reimbursement for Independent Educational Evaluations**

Ms. H contends that she is entitled to reimbursement for the independent educational

evaluations conducted by Promer and Goff.

Alabama's IDEA regulations state that parents have the right to obtain independent

educational evaluations of their child so long as they satisfy agency criteria.  Ala. Admin. Code

r. 290-8-9.02(4); *see also* 34 C.F.R. § 300.502(b)(1).  Agencies must provide the agency criteria

to parents upon request.  Ala. Admin. Code r. 290-8-9-.02(4)(a).  By default, a parent must pay

for the examination; however, a parent may qualify to have the independent educational

evaluation at public expense.  Specifically,

> A parent has the right to an independent educational evaluation at public expense if the parent disagrees with an individual evaluation(s) (e.g., OT, PT, achievement) obtained by the public agency.  If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either file a due process hearing request to show that its evaluation is appropriate or ensure that the independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing that the evaluation obtained by the parent did not meet agency criteria.  If the final decision in a due process hearing is that the agency's evaluation is appropriate, the parent still has the right to an independent educational evaluation, but not at public expense.

Ala. Admin. Code r. 290-8-9.02(4)(d).  In other words, a parent is entitled to an independent educational evaluation at public expense if (1) a parent disagrees with an individual evaluation conducted by the public agency; and (2) the agency either (a) does not file for a due process hearing without unnecessary delay or (b) does so file, but does not demonstrate, at that hearing, either that its own evaluation was appropriate or that the independent educational evaluation did not meet agency criteria.

Ms. H first argues that she is entitled to reimbursement because MPS requested a due process hearing too late after Ms. H asked for an independent educational evaluation due to her disagreement with MPS's evaluation.  In this case, the hearing officer determined that MPS filed for a due process hearing "without any unreasonable delay with respect to [Ms. H's] request for reimbursement."  H.O.'s Dec. at 39.  Ms. H argues that the hearing officer's use of the word "unreasonable" rather than "unnecessary" was legal error.  (Doc. #28 at 81.)  The court agrees that the word used in the regulation is "unnecessary."  However, that does not settle the issue; Ms. H still must show that the delay in this case was "unnecessary."

Ms. H claims that the delay was unnecessary because MPS failed to file a due process complaint until October 29, 2009, despite the fact that Ms. H notified MPS, on September 8,

2009, that she disagreed with MPS's evaluation and "requested independent educational evaluations at public expense." (Doc. #28 at 79.) However, much happened in between these dates. On September 10, 2009, just two days after Ms. H's request for independent educational evaluations at public expense, MPS's counsel sent a letter to Ms. H informing her that she was entitled to only one independent educational evaluation at public expense, and asking whether she sought reimbursement for the evaluation by Goff or Promer. Def.'s Ex. 32 at 1. Additionally, the letter asked Ms. H to identify her disagreement with T.H.'s evaluations. Def.'s Ex. 32 at 1. Ms. H did not respond to this letter. *See, e.g.*, H.O. Ex. 8 at 2. Instead, on September 18, 2009, Ms. H obtained an independent educational evaluation from Promer. After waiting until September 25, 2009, MPS asked Ms. H again to "[p]lease respond" to its request for additional information. Def.'s Ex. 34 at 1. That day, Ms. H., through her lawyer, responded, stating that she did not agree with the evaluations conducted by MPS without describing any particular disagreement, and briefly describing the independent educational evaluation she obtained from Promer and the independent educational evaluation she would obtain from Goff. *See* Def.'s Ex. 35 at 1. Shortly thereafter, on September 30, 2009, Ms. H obtained the independent educational evaluation from Goff.

On October 5, MPS's counsel informed Ms. H that it would contest reimbursement for independent educational evaluations that she obtained. Def.'s Ex. 36 at 1. On October 6, Ms. H declined a proposal by the school to conduct its own speech and language assessment of T.H. to compete with the independent educational evaluation conducted by Promer. Def.'s Ex. 37 at 1. Additionally, on October 8, 2009, Ms. H filed a due process hearing request that sought reimbursement from MPS for the two independent educational evaluations. H.O. Ex. 4 at 1.

Subsequently, on October 29, 2009, MPS filed a due process hearing request to contest providing reimbursement for Ms. H's independent educational evaluations.  H.O. Ex. 8 at 1.

Based on the above facts, the court agrees with the hearing officer that any delay in MPS filing for a due process hearing request on the reimbursement issue was not "unreasonable," and also finds that it was not "unnecessary."  MPS promptly responded to Ms. H's initial request for reimbursement by asking her what about the previous evaluation she disagreed with.  MPS may not "require" Ms. H to respond to this inquiry, and may not "unreasonably[20] delay" either reimbursing or contesting reimbursement in a due process hearing.  Ala. Admin. Code r. 290-8-9-.02(4)(g).  However, in this case, MPS did not require Ms. H to respond, nor did it unreasonably delay in waiting 15 days for her to respond to its inquiry.  Moreover, on September 25, once Ms. H responded to MPS's inquiry,  MPS replied in a prompt manner on October 5, informing Ms. H that it would contest reimbursement.  Moreover, Ms. H filed her own due process hearing request for reimbursement on October 8.  At this point, it made little sense for MPS to rush to file its own due process complaint contesting the same exact thing that would be disputed in Ms. H's complaint.  In short, the court finds that MPS's delay was not unnecessary and thus did not require MPS to reimburse Ms. H.  *See P.R. v. Woodmore Local Sch. Dist.*, 256 Fed. App'x. 751, 755 (6th Cir. 2007) (holding that parents were not entitled to reimbursement for an independent educational evaluation, because although the school district failed to initiate a due process hearing to validate the appropriateness of its evaluation, the parents had filed for a due process hearing contesting the appropriateness of the school district's evaluation).

---

[20]This provision of the regulations uses the word "unreasonably" as opposed to "unnecessary."

Ms. H next argues that she is entitled to reimbursement because MPS's evaluation of T.H. was not appropriate. However, as previously discussed, *supra*, the court concludes that these evaluations were appropriate.

In conclusion, the court finds that MPS filed for a due process hearing without unnecessary delay and demonstrated at the hearing that its evaluations were appropriate. Therefore, the court agrees with the hearing officer's determination that Ms. H is not entitled to reimbursement for the independent educational evaluations conducted by Goff and Promer.[21]

## D.    Child-Find Requirements

The Board's Memorandum Brief asserts that "[the Board] does not concede [the hearing officer's] finding that it failed to comply with the Child-Find requirements of IDEA," and proceeds to brief the issue for several pages. (Doc. #32 at 19.) However, this issue is not properly before the court.

"Any party aggrieved by the findings and decision [of the hearing officer] . . . shall have the right to *bring a civil action*" to appeal the hearing officer's findings, and "*shall have 90 days from the date of the decision* of the hearing officer to bring such an action." 20 U.S.C. § 1415(2)(A), (B) (emphasis added). This issue was not *brought* in a civil action, nor was it raised within 90 days from the date of the hearing officer's decision. Accordingly, the court will not

---

[21]Even if Ms. H were able to prevail on the issue of reimbursement, she could only receive reimbursement for one of the two evaluations, because "[a] parent is entitled to *only one independent educational evaluation at public expense each time the public agency conducts an individual evaluation(s) with which the parent disagrees*." Ala. Admin. Code r. 290-8-9.02(4)(h) (emphasis added).

address whether the hearing officer correctly determined that the Board violated IDEA's child-find requirements.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED as follows: the Board's Motion for Summary Judgment, or in the Alternative, Motion for Judgment on the Pleadings (Doc. #31) is GRANTED IN PART and DENIED IN PART, and Ms. H's Motion for Summary Judgment, or in the Alternative, For Judgment on the Pleadings (Doc. #27) is DENIED.  Specifically,

1.  The Board is granted judgment on the record on the issue of whether T.H. was denied a FAPE due to the hearing officer's failure to find that T.H. had an Other Health Impairment or Specific Learning Disability under IDEA;

2.  The Board is granted judgment on the record on the issue of whether Ms. H is entitled to reimbursement for independent educational evaluations conducted by Goff and Promer;

3.  The court will not consider the Board's argument that the hearing officer erred with respect to the child-find issue, as that issue is not properly before this court;

4.  The case will proceed with respect to Ms. H's § 504 claim and request for attorney's fees claim; and

5.  The Parties' Motions are DENIED AS MOOT to the extent that they request a judgment on the pleadings.

Done this 14th day of February, 2011.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE