IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| Ms. H., individually and as | ) | |
| mother and next friend of | ) | |
| T.H., a minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) CIVIL ACTION NO.  2:10cv247-WHA-SRW | |
| | )                         (WO) | |
| MONTGOMERY COUNTY | ) | |
| BOARD OF EDUCATION | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This case is before the court on Plaintiff's Motion for Class Certification, and the parties'
cross Motions for Summary Judgment.  The plaintiff in this action, Ms. H, who is filing this
lawsuit individually and on behalf of her daughter, T.H., filed a Motion for Class Certification
on December 22, 2010 (Doc. #56).  Additionally, Ms. H filed a Motion for Partial Summary
Judgment on January 28, 2011 (Doc. #68).  On the same day, Defendant, Montgomery County
Board of Education (the "Board"), filed its own Motion for Summary Judgment (Doc. #70).  The
cross Motions for Summary Judgment have been filed with respect to individual claims brought
by Ms. H, but not her class claims.

Ms. H filed a Second Amended Complaint in this court on January 26, 2011 (Doc. #67).
In the Second Amended Complaint, Ms. H (1) made individual and class claims under § 504 of
the Rehabilitation Act of 1973 ("§ 504"); (2) sought to appeal all issues on which she did not
prevail at an Individuals with Disabilities Education Act ("IDEA") hearing; and (3) sought to

recover attorney's fees.  This court granted summary judgment in favor of the Board and against Ms. H on the IDEA issue.  *See Ms. H. v. Montgomery Cnty. Bd. of Educ.*, No. 2:10cv247-WHA-SRW, 2011 WL 666033 (M.D. Ala. Feb. 14, 2011).

The court concludes, after consideration of the parties' briefs, supporting evidence, and the law, that Ms. H's class claims are due to be DISMISSED for lack of standing, Ms. H's Motion for Class Certification is due to be DENIED AS MOOT, and the cross Motions for Summary Judgment are due to be DENIED.

## II.  <u>STANDARD OF REVIEW</u>

### A.     **Motion for Class Certification**

The question of class certification is a procedural one distinct from the merits of the action.  *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).[1]  In deciding whether to certify a class, a district court has broad discretion.  *Washington v. Brown & Williamson Tobacco Corp*., 959 F.2d 1566, 1569 (11th Cir. 1992).  Although a district court is not to determine the merits of a case at the certification stage, sometimes "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question."  *Id.* at 1560 n.11.

A class action may only be certified if the court is satisfied, after a rigorous analysis, that the prerequisites of Federal Rule of Civil Procedure 23 have been satisfied.  *Gilchrist v. Bolger*, 733 F.2d 1551, 1555 (11th Cir. 1984).  "A class action may be maintained only when it satisfies all the requirements of Fed. R. of Civ. Pro. 23(a) and at least one of the alternative requirements

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the former Fifth Circuit.

of Rule 23(b)."  *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997).  A

court must evaluate whether the four requirements of Rule 23(a) are met: numerosity,

commonality, typicality, and adequacy of representation.  Furthermore, the court must determine

whether the action may be maintained as one of the classes under Rule 23(b).  The party seeking

to maintain the class action bears the burden of demonstrating that all prerequisites to class

certification have been satisfied.  *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1363 (11th Cir.

1984).


**B.      Motion for Summary Judgment**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . .

the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes

demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  Once the moving party

has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a

genuine issue for trial.  *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is

genuinely disputed, must support their assertions by "citing to particular parts of materials in the

record," or by "showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  Acceptable materials under Rule 56(c)(1)(A) include

"depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

In resolving the present cross Motions for Summary Judgment the court will construe the facts in the light most favorable to the nonmovant when the parties' factual statements conflict or inferences are required. *Barnes v. Sw. Forest Indus.*, 814 F.2d 607, 609 (11th Cir. 1987).

## III. <u>FACTS</u>

The admissible evidence submitted by the parties reveals the following facts, viewed in a light most favorable to the non-movant, as required by the governing standard:[2]

---

[2]Factual issues are evaluated differently when evaluating a motion for class certification as compared with a motion for summary judgment. This opinion, for the sake of brevity and simplicity, discusses the facts of this case in this section under the summary judgment standard. The court is not, however, using the summary judgment standard to evaluate facts for the purposes of the class certification inquiry.

4

**A.       The Board's Section 504 Procedures**

The Board oversees the operations of Montgomery Public Schools ("MPS").  MPS is a

recipient of federal financial assistance.  Therefore, it is required to comply with § 504, which

prohibits, generally, the exclusion of, denial of benefits to, or discrimination against, an

individual solely on the basis of that individual's disability.  *See* 29 U.S.C. § 794(a).  In an

attempt to comply with § 504, the Board has created a Procedural Guide.[3]

The Procedural Guide establishes a timeline for evaluating and accommodating disabled

students under § 504.  This timeline is a outline-style list of steps that explain, *inter alia*, how to

identify, evaluate, and accommodate disabled students, as well as how to deal with parental

complaints.  The Procedural Guide's appendix contains a number of documents that are

applicable to various timeline events.  For example, Appendix G is a list of example

accommodations that can be provided to § 504 students.  Doc. #84-7 at 14-16.  Appendix R is a

form given to parents to notify them of the rights established by § 504.  Doc. #84-7 at 33.

The first point in the § 504 timeline is a referral for a § 504 evaluation.  A child may be

referred from a number of sources, including parents and teachers.

After a child is referred, the timeline requires that evaluators "evaluate/gather

information/data."  This includes gathering (1) medical documentation if available; (2) grades;

(3) test scores; (3) observations; (4) behavioral rating scales; (5) disciplinary information; (6)

individual achievement/assessment inventories; and (7) special education information.

---

[3]There are two copies of the Procedural Guide in evidence, one from 2004 and one from
2010.  Because neither party argues that they materially differ or did not apply at relevant times
during this case, the court will treat them as establishing the same procedures during all relevant
times of T.H.'s educational career.

5

Next, an eligibility determination team convenes to determine the child's eligibility for § 504 services. This team includes, among others, (1) teachers; and (2) the local school § 504 coordinator. The team is instructed to consider the gathered information and data, to make a determination, and to complete two forms. The first form is a "Record of Eligibility Placement Determination," which, among other things, requires the evaluators to certify that they (1) notified parents or guardians of their intent to evaluate a child; and (2) considered a variety of documented information. The second form is a "Parent Notification of Eligibility Determination," that requires the team to notify the parent of an eligibility determination, invite the child's parents to a § 504 meeting, and ask the parent to indicate whether he or she will attend the meeting.

Subsequently, an accommodation planning team meets, which includes (1) a local school § 504 coordinator; (2) parents; and (3) teachers. The accommodation planning team is told to write an accommodation plan by (1) considering accommodations appropriate to a student's disability;[4] (2) considering participation in a state assessment program; and (3) completing a § 504 student accommodation plan form. The team then notifies faculty or staff who need to know about the plan, share the plan if necessary, and monitor its implementation.

The Procedural Guide also requires that a student's § 504 plan be reviewed at least every year, by (1) sending a request for the parent to attend the review; (2) reconvening the § 504 planning committee; (3) sending the parent a new "notice of intent to evaluate" document; and

---

[4]The Procedural Guide contains a list of example accommodations in Appendices G and I. Appendix G states that it is merely a list of examples, and is "not exhaustive."

(4) revising the plan if needed.  The Procedural Guide does not require that this review include

additional tests or assessments of the student.

The Procedural Guide also discusses how to deal with disputes over the § 504 process, as

well as impartial due process hearings.  Upon receiving a complaint, the school must provide the

complainant with a "§ 504/Americans with Disabilities Act Grievance Procedure" form that

explains the impartial due process procedure that MPS provides to parents if they request such a

hearing.


**B.      Elementary School**

T.H. is a student in Montgomery Public Schools.  She began attending MPS as a first

grade student in the Fall of 1999.  In first and second grade, T.H. had behavioral problems: she

was disruptive in class, and had difficulty finishing her school work.  T.H. did not receive § 504

services at this time.

In January, 2001, a school psychologist evaluated T.H. and concluded that she had

symptoms of attention deficit disorder.[5]  Because of this, and the fact that T.H. had bladder

control problems and had a seizure at an early age, the psychologist recommended further

testing, follow-up counseling, and various aids and services.

---

[5]The psychologist's perception of T.H. was not wholly negative.  The psychologist noted,
among other observations, that T.H. (1) "was socially confident;" (2) "generally understood
instructions;" (3) had "good concentration;" (4) had an IQ score in the "low-average" range; and
(5) had "average" verbal comprehension.  Doc. #59-2 at 6-11.

At the beginning of third grade, in the fall of 2002, T.H.'s doctor diagnosed her with attention deficit hyperactivity disorder and placed her on medication.  After T.H. continued to have trouble in school, Ms. H asked MPS whether T.H. was eligible for § 504 services.

In October, 2002, MPS determined that T.H. was disabled as defined by § 504, and was entitled to § 504 services.  Accordingly, MPS began creating a new § 504 plan for T.H. each year.


**C.     Middle School**

T.H. entered middle school as a seventh-grader in August 2005.  MPS created a new § 504 plan for T.H. in September, 2005.

At the time this new § 504 plan was created, T.H.'s disabilities had worsened.  T.H.'s bladder control problem caused T.H. to wet herself multiple times per week, and this forced T.H. to occasionally leave school to go home to shower and change.  T.H.'s § 504 plan thus included a notation that T.H. must be allowed to go to the restroom when needed.

In eighth grade, T.H.'s health problems continued to worsen.  T.H. developed an additional health condition: a mitral valve prolapse, which caused her to have trouble breathing, and an abnormal racing heartbeat.

Throughout middle school, despite the fact that T.H. received a § 504 plan for both seventh and eighth grade, she struggled academically.  While T.H. graduated from middle school to high school, MPS informed Ms. H that T.H. did not earn her passing grades, rather, her grades were modified upward so that she would pass.

D.    **High School**

T.H. began high school at Sidney Lanier High School, an MPS high school, in August, 2007.  T.H. received a new § 504 plan in May, 2007, just prior to finishing middle school, and received a new § 504 plan in September, 2007, approximately one month after she began ninth grade.

MPS developed a new § 504 plan for T.H. each year while T.H. was in high school. Despite these new plans, T.H.'s grades remained low throughout high school.  *See, e.g.*, Doc. #59-1 at 3.  Even though T.H. struggled academically, T.H.'s § 504 plans remained essentially the same[6] until her twelfth grade plan.

In twelfth grade, the current academic year, MPS granted Ms. H's request to transfer T.H. to Lee High School.  Subsequently, MPS made substantial changes to T.H.'s twelfth grade § 504 plan, adding thirteen new accommodations, some of which were on the pre-printed accommodations checklist and some were inserted as notations, as well as notations to explain specifically how to implement T.H.'s accommodations.  Doc. #59-1 at 5-7.[7]  These accommodations included (1) having T.H. attend afternoon math tutoring; (2) providing T.H. a study guide so she would not have to copy information from the chalkboard onto her own paper; and (3) giving T.H. alternative testing techniques, such as multiple choice tests, word banks, or clues.  *Id.*

---

[6]For example, from ninth grade to tenth grade, MPS removed two accommodations it previously gave T.H. and added only one: "[m]onitor the rate you present material."  Doc. #59-3 at 7.  From tenth grade to eleventh grade, MPS removed six accommodations, and added three: (1) "[s]eat student near someone who will be helpful and understanding;" (2) "[u]se verbal cues;" (3) "[c]ommunicate orally, visually, and repeat as needed."  Doc. #59-2 at 51.

[7]Some of these new accommodations were added at Ms. H's request.

In addition to T.H.'s low grades, T.H. passed two and failed two of her Alabama High School Graduation Examinations. As a tenth grader, T.H. passed the language section of the graduation exam, and also passed the biology section, despite failing biology during the school year. T.H. narrowly failed the math and social studies sections of the exam. As of today, T.H. has passed only three of her four graduation exams; she has yet to pass the social studies exam.

In 2009, T.H. was evaluated for special education services under IDEA. However, as discussed in this court's prior Opinion, T.H. was found ineligible for special education services under IDEA.

The evidence establishes that MPS and Ms. H had trouble communicating with each other. On multiple occasions during T.H.'s time in high school, Ms. H called and wrote letters to MPS, complaining that T.H.'s grades were poor and that her § 504 plans were insufficient. On some occasions, MPS failed to respond. Other times, Ms. H was not satisfied with the response because, for instance, MPS did not incorporate her suggested accommodations into T.H.'s § 504 plan. On the other hand, the Board points out that Ms. H could not attend several § 504 meetings, *see, e.g.*, Doc. #59-2 at 57-79; canceled several meetings after they were scheduled, *see, e.g.*, Doc. #59-2 at 62; showed up so late to a meeting that it had to be canceled, *see, e.g.*, Doc. #59-2 at 65, and did not respond to a request for her to attend a meeting, *see, e.g.*, Doc. #59-2 at 67.

**E.      Ms. H's Asserted Reasons for T.H.'s Academic Failures**

Ms. H places the blame for T.H.'s academic failures on MPS's alleged failure to properly deal with T.H.'s disability. She asserts that MPS failed to comply with a number of procedures

10

described in the Department of Education's § 504 regulations for identifying T.H.'s disability and making accommodations for T.H.[8]  Additionally, Ms. H notes that MPS never materially adjusted T.H.'s § 504 plans despite the fact that T.H.'s grades were not improving, or, at times, were worsening.  Ms. H also presents evidence that John Goff, a clinical psychologist and neuropsychologist who evaluated T.H., said that the § 504 accommodations "obviously weren't working."  Doc. #24-5 at 55:3-14.[9]  Finally, Ms. H states that the Board never conducted new tests and assessments on T.H. when it created new § 504 plans for T.H. each year.

**F.      The Board's Asserted Reasons for T.H.'s Academic Failures**

While Ms. H claims that the sole reason for T.H.'s poor performance during high school was T.H.'s disability, the Board argues that T.H.'s poor performance was caused by other issues.  First, the Board notes that T.H. was frequently absent or tardy from school, or left school early.  For example, during the 2008-09 school year, T.H. was tardy 21 times, absent 7 times, and Ms. H often checked T.H. out of school early.  Some of these tardies, absences, and early check-outs were unexcused.  T.H. not only had unexcused tardies to her first class of the day, but also to classes in the middle and end of the day, after she was already at school.

---

[8]Ms. H asserts that neither Gloria Bean, MPS's § 504 coordinator, nor Ardelia Skipper, Lanier High School's § 504 coordinator, are "qualified to interpret the results of any evaluations."  Doc. #69 at 44.  Rather, Ms. H states that, because Bean and Skipper do not have a clinical background, they are not "guidance counselors, not clinicians."  *Id.*

[9]For more information about T.H.'s independent educational evaluations, see this court's prior opinion on Ms. H's IDEA claims.  *Ms. H.*, 2011 WL 666033, at *1.

Second, T.H. had a poor attitude toward school.  A personal inventory conducted of T.H., prior to T.H.'s sophomore year, revealed that T.H. hates school.[10]  T.H. "often would either not answer test questions or would not complete them.  On occasion [T.H.] would simply lay her head on the table where she sat and refuse to participate in class."  Doc. #24-14 at 42.  Meredith Edwards, one of T.H.'s teachers, said that T.H. was "very capable" of doing her school work, but she was only "sometimes" attentive, and simply did not complete her assignments.[11]  The Board also notes that part of the reason for T.H.'s poor grades was that she did not turn in work or did not complete her class work.  T.H. had also been disciplined for using her cell phone in school at least three times, one of those times resulting in a suspension because T.H. did not cooperate while being disciplined.  Doc. #59-2 at 55.

Third, the Board states that T.H.'s grades declined at a time when T.H. had conflicts at home.  Specifically, Ms. H testified that she and T.H. fought about T.H.'s friends and T.H.'s school performance.

Fourth, the Board noted that T.H. and Ms. H did not take advantage of opportunities to improve T.H.'s grades and improve her chances at passing her graduation exams.  The evidence

---

[10]This personal inventory revealed that T.H. had a very negative attitude toward school, associating with others, and her family.  In this personal inventory: (1) in response to the prompt, "I do not like . . .," T.H. wrote: "people;" (2) in response to the prompt, "I would like to learn about . . .," T.H. wrote: "nothing;" (3) in response to the prompt, "I would be much better off if . . .," T.H. wrote: "people leave me alone;" (4) in response to the prompt, "[i]f I was allowed to help in class I would . . .," T.H. wrote: "i wouldnt help;" and (5) in response to the prompt, "[i]f I could change anything I would first . . .," T.H. wrote: "I would change my family."  Doc. #24-9 at 14.

[11]The Board notes that T.H.'s played volleyball on her high school volleyball team in tenth grade.  Although she did not play during eleventh grade due to her poor grades, T.H. continued to practice with the volleyball team, attended the games, and sat with the team.

establishes that MPS offered tutoring to T.H. but T.H. failed to attend tutoring.  *See, e.g.*, Doc.
#59-2 at 12, 54.  For example, Meredith Edwards, T.H.'s biology teacher, stated that she offered
tutoring to T.H., but T.H. never attended her tutoring sessions, while other students did.


**G.      Impartial Due Process Hearing**

Prior to bringing this suit, Ms. H requested an impartial due process hearing under both §
504 and IDEA.  The Board held an IDEA hearing, but not a § 504 hearing.  The parties never
administratively adjudicated the issues now before this court.

The parties dispute as to whose fault it is that the § 504 claims were not adjudicated in an
impartial due process hearing.  The Board argues that Ms. H made a request for a due process
hearing in a letter dated July 21, 2009, and then withdrew that request.  Specifically, the Board
claims that (1) Deborah Mattison, Ms. H's counsel, told the Board via telephone that she was
withdrawing her request for a § 504 hearing on September 8, 2009 (Doc. #70-3 at 5); (2) the next
day, the Board sent a letter to Mattison, confirming withdrawal of the § 504 hearing, and sending
a copy to the Board's § 504 coordinator (Doc. #70-3 at 7);  and (3) in subsequent correspondence
one month later, Rachel McGinley, Ms. H's other counsel, sent a letter to the Board regarding
the development of T.H.'s § 504 plan without referencing a § 504 hearing (Doc. #70-3 at 8).

Ms. H asserts that she never withdrew the request for a § 504 hearing.  Ms. H states that
she made two requests for a due process hearing.  First, on July 21, 2009, Ms. H requested a §
504 hearing, to which the Board never responded.  Ms. H subsequently reiterated her request for
a § 504 hearing on August 25, 2009.  Ms. H does not deny stating that she would withdraw the
request on the telephone, saying that she agreed to do so in exchange for a settlement of some

sort, but claims that she did not receive any letter from the Board confirming withdrawal of the §

504 hearing request.

The IDEA hearing transcript provides additional information regarding the status of the

parties' § 504 hearing.  Early in the IDEA hearing on September 10, 2009, the following

discussion occurred:

> MS. TATUM [Counsel for Defendant]: . . . . I realize there may be some Section
> 504 issues that could come up related to Child Find, but that this is not a Section
> 504 hearing.
>
> THE HEARING OFFICER: Yeah, it's not.  But I do think 504 is relevant because
> I think it's the position of the Petitioner – or at least my understanding they are
> saying even though she was getting 504 services that she should have been being
> evaluated for special ed services.
>
> MS TATUM: I just don't want –
>
> THE HEARING OFFICER: But it's not a 504 hearing.  And they have asked for a
> 504 hearing.  I don't know what the status of that is.  But the school system needs
> to tend to that and get something arranged for the 504 hearing.
>
> MS. MATTISON [Counsel for Plaintiffs]: We do understand that.  And our
> reference to it – I mean, because of Babicz [v. Sch. Bd. of Broward Cnty., 135
> F.3d 1420, 1422 n.10 (11th Cir. 1998)], we did want to make clear that at the very
> least, this is an attempt to exhaust under 504.  We don't intend to try the 504
> claims, obviously, but there will be reference to 504.
>
> THE HEARING OFFICER: All right.  That's fine.  But it is not a 504 hearing.

Doc. #24-1 at 26:11 - 27:23.  No evidence shows that the parties had any further discussion

regarding a § 504 hearing.


## IV.  DISCUSSION

The court will first address Plaintiff's Motion for Class Certification, and then will

discuss the cross Motions for Summary Judgment.

**A.      Motion for Class Certification**

Ms. H seeks, on behalf of a proposed class, declaratory and prospective injunctive relief, to include: (1) an order declaring that the Board's policies violate the rights of students with disabilities under § 504; and (2) an injunction enjoining the Board from continuing to violate such students' rights.  She suggests that the injunction should include an order requiring the Board to revise its procedures, properly implement § 504's regulations, and properly train its staff.  *See* Docs. #67 at 29-30; #57 at 57; #89 at 66.

The proposed class is as follows:

> All students with a disability, as that term is defined by § 504 of [the] Rehabilitation Act, 29 U.S.C. 794, who have resided within the Montgomery County Board of Education's jurisdiction at any time since July 2007, excluding those students who have received special education under the Individuals with Disabilities Education Improvement At, 20 U.S.C. 1400 et[] seq. for that entire time period.

*See* Doc. #56 at 1.

The Eleventh Circuit has stated that "any analysis of class certification must begin with the issue of standing."  *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  "Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others."  *Id.*; *see also AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007) (" Standing . . . 'is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.'") (citations omitted).

To establish Article III standing, a plaintiff has the burden to show that (1) she has "an injury-in-fact;" (2) "the injury is fairly traceable to the defendant['s] conduct;" and (3) "a

favorable judgment is likely to redress the injury." *Mulhall v. UNITE HERE Local 355*, 618

F.3d 1279, 1286 (11th Cir. 2010) (citation omitted).  With regard to redressability, the Supreme

Court requires that it is "likely," not merely "speculative," that the "plaintiff's injury will be

remedied *by the relief plaintiff seeks in bringing suit*."  *Sprint Commc'ns Co. v. APCC Servs.,*

*Inc.*, 554 U.S. 269, 273-74 (2008) (emphasis added) (citing *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560-61 (1992)).

        In this case, the problematic element of the standing inquiry is redressability.  In her

briefs, Ms. H stated that T.H. will graduate from MPS this year, whether or not she passes her

graduation exams.[12]  Because MPS's school year ends this month, this means that T.H. will no

longer be a student at MPS by the time this court could grant any class relief, and therefore,

prospective injunctive relief affecting how MPS treats its § 504 students, which is what Ms. H

seeks as class relief, would have no impact on T.H.  In fact, at the pretrial conference, held on

May 5, 2011, the court asked Ms. H's counsel whether the relief she sought on behalf of the

class would affect T.H., and she responded that it would not.[13]  Therefore, Ms. H fails to satisfy

the redressability element of the standing inquiry.  *See, e.g.*, *Roberts v. Madigan*, 921 F.2d 1047,

1052 (10th Cir. 1990) (holding that injunctive relief could not redress plaintiff's injury because

---

        [12]According to statements made by the parties at the pretrial conference for this case,
T.H. will graduate with a non-standard diploma if she does not pass all of her graduation exams.
Ms. H's counsel suggested that T.H. may receive some tutoring from MPS so that she can pass
her graduation exams after graduation and then receive a standard diploma, though this tutoring
would not occur in a standard classroom setting.  Ms. H's counsel also indicated that T.H. would
not graduate if she failed any classes this year, though she has not suggested that is a likely
possiblity.  These facts do not indicate that the relief Ms. H requests is "likely" to affect T.H.
instead of simply "speculative."

        [13]The court appreciated Ms. H's counsel's candor and professionalism in admitting this
fact.

plaintiff was no longer in the classroom where the prospective injunctive relief would apply); *see also Schanou v. Lancaster Cnty. Sch. Dist. No. 160*, 62 F.3d 1040, 1043 (8th Cir. 1995) (holding, on mootness grounds, that a request for injunctive relief no longer presented a live controversy after the plaintiff student had graduated); *Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) ("As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders their claims for injunctive relief moot . . . . Because the named plaintiffs will not benefit from a favorable ruling on the question implicating injunctive relief, we hold that this question is moot as to them.").

Ms. H cannot satisfy the redressability element of the standing inquiry, so the court concludes that she lacks standing to bring claims on behalf of the proposed class.  Therefore, her class claims are due to be DISMISSED for lack of standing, and her Motion for Class Certification is due to be DENIED AS MOOT.

**B.      Cross Motions for Summary Judgment**

The court now turns to the parties' cross Motions for Summary Judgment.  This court previously found that T.H. was not eligible for special education services under IDEA.  *See Ms. H.*, 2011 WL 666033, at *21.  The issue currently before the court is different.  Unlike the IDEA issue, where the question was whether T.H. was eligible for the protections of the statute, T.H.'s eligibility for § 504 is not at issue here.[14]  Rather, both the Board and Ms. H agree that T.H. is

---

[14]The Board argues that because it was found not to have violated IDEA by this court, it cannot be liable under § 504, because IDEA's protections exceed those of § 504 in the special education context.  Whether or not the Board's presumption of § 504's scope is correct, its argument is due to be rejected.  The reason this court previously held that the Board did not violate IDEA was because T.H. *was not eligible* for special education under IDEA; the court

eligible for § 504 services.  The question presented today deals with the Board's compliance with § 504.

          1.     *Applicable Statutes and Regulations*

               i.     Section 504 of the Rehabilitation Act

IDEA and § 504 both apply to the context of special education.  While the statutes have some overlap, they are distinct.  IDEA contains a detailed "web of procedural regulations . . . [that] govern[] the school district's identification, assessment and treatment plans for disabled students."  *See, e.g.*, *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453-54 (5th Cir. 2010).  If a child qualifies as a "child with a disability," as defined by IDEA, the child gains the protections of IDEA, and schools subject to IDEA's requirements have an "affirmative obligation" to ensure that the child receives a free appropriate public education ("FAPE").  *Id.* at 453.

Section 504's statutory text, unlike IDEA's, is short and straightforward.  Section 504 states, in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations as may be necessary to carry out the amendments to this section made by the Rehabilitation, Comprehensive Services, and Developmental Disabilities Act of 1978.

---

never actually addressed whether the Board had complied with IDEA.  In this case, however, the Board concedes that T.H. is eligible for § 504 protection, which makes the § 504 "compliance" issue in this case wholly different than the IDEA "eligibility" issue.  To put it another way, § 504 compliance is to "apples" as IDEA eligibility is to "oranges."

29 U.S.C. § 794(a) (emphasis added).  In contrast to IDEA, § 504's statutory text does not create

a number of different procedures that a school district must follow to comply with the statute.

*See Sellers by Sellers v. Sch. Bd. of Mannassas, Va.*, 141 F.3d 524, 528 (4th Cir. 1998)

("Whereas IDEA affirmatively requires participating States to assure disabled children a free

appropriate public education . . . section 504 of the Rehabilitation Act instead prohibits

discrimination against disabled individuals.").  Rather, under § 504's text, a school district may

not (1) (a) exclude; (b) deny benefits to; or (c) subject to discrimination; (2) any student; (3)

solely on the basis of his or her disability.


      ii.      Section 504's Regulations[15]

The Department of Education has promulgated regulations under Section 504.

First, 34 C.F.R. § 104.4 reiterates § 504's textual prohibition by stating, in similar

wording to § 504, that "[n]o qualified handicapped person[16] shall, on the basis of handicap, be

excluded from participation in, be denied the benefits of, or otherwise be subjected to

discrimination under any program or activity which receives Federal financial assistance."

Section 104.4(b) adds additional rules that federal funding recipients, such as MPS, which

provide an "aid, benefit, or service," must follow.   These rules generally reiterate that qualified

handicapped persons are due fair treatment, and generally must be provided an opportunity to

---

[15]This is intended only as a general, not comprehensive, discussion of § 504's regulations.

[16]"Qualified handicapped person" means, with respect to "public preschool[,] elementary, [or] secondary . . . educational services, a handicapped person (i) of an age during which nonhandicapped persons are provided such services, (ii) of any age during which it is mandatory under state law to provide such services to handicapped persons, or (iii) to whom a state is required to provide a free appropriate public education under [IDEA]."  34 C.F.R. § 104.3(l)(2).

participate in aids, benefits, or services provided to the non-disabled.  Section 104.4(b)(1)(iii)

requires that aids, benefits or services provided to the disabled must be "as effective as that

provided to others."  Section 104.4(b)(2) explains that, "to be equally effective," an aid, benefit,

or service need not "produce the identical result or level of achievement for handicapped and

nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the

same result, to gain the same benefit, or to reach the same level of achievement, in the most

integrated setting appropriate to the person's needs."

    While § 104.4(b) arguably interprets the language of § 504, other regulations go further

and speak with more specificity.  Section 104.32, like the "child find" duty spelled out in

IDEA,[17] requires that federal funding recipients who operate public elementary or secondary

schools "identify and locate every qualified handicapped person residing in the recipient's

jurisdiction who is not receiving a public education . . . [and t]ake appropriate steps to notify

handicapped persons and their parents or guardians of the recipient's duty" under the § 504

regulations.

    The "duty" referred to in § 104.32 is explained by other regulations.  Section 104.33(a)

requires, like IDEA, but unlike § 504's text, that federal funding recipients "provide a free

appropriate public education to each qualified handicapped person who is in the recipient's

jurisdiction."  Section 104.33(b)(1) explains that an "appropriate education is the provision of

regular or special education and related aids and services that (i) are designed to meet individual

---

[17]Pursuant to the "child find" provision of IDEA, a school district "has a duty to identify and evaluate children who are suspected of having a qualifying disability within a reasonable time after school officials are placed on notice."  *D.R. ex rel. Courtney R. v. Antelope Valley Union High Sch. Dist.*, 746 F. Supp. 2d 1132, 1145 (C.D. Cal. 2010).

educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met and (ii) are based upon adherence to procedures that satisfy the requirements of §§ 104.34, 104.35, and 104.36."  This requirement may be met by providing a child with an Individualized Education Program in compliance with IDEA.  34 C.F.R. § 104.33(b)(2).

Section 104.34 requires funding recipients to attempt to educate handicapped and nonhandicapped students in the same setting to the "maximum extent appropriate to the needs of the handicapped person," by using "supplementary aids and services."  34 C.F.R. § 104.34(a).

Section 104.35 describes requirements for evaluating students who need or are suspected to need special education or related services due to handicap.  Under this section, prior to making an initial placement of a handicapped student in regular or special education, and prior to "any subsequent significant change in placement," a recipient must conduct an evaluation.  34 C.F.R. § 104.35(a).  To make this placement decision, recipients must (1) consider information from a variety of sources, "including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior;" (2) establish procedures to ensure information obtained from these sources is documented and carefully considered; (3) ensure placement decisions are made by a group of persons, including a person "knowledgeable about the child, the meaning of the evaluation data, and the placement options;" and (4) ensure that the placement complies with § 104.34.  Recipients must also establish "standards and procedures" for evaluations that ensure that the tests and evaluation materials are selected, administered, and interpreted effectively.  34 C.F.R. § 104.35(b), (c).

Section 104.35 further requires that recipients establish procedures for periodic reevaluations that comply with the above requirements for evaluations.  34 C.F.R. § 104.35(d).

One way to comply with reevaluation requirements is to comply with IDEA's reevaluation requirements.  *Id.*[18]

Finally, § 104.36 requires that recipients establish and implement "a system of procedural safeguards that includes notice, an opportunity for the parents or guardian of the person to examine relevant records, an impartial hearing with opportunity for participation by the person's parents or guardian and representation by counsel, and a review procedure."  One way to comply with this provision is to comply with IDEA's procedural safeguard requirements.  34 C.F.R. § 104.36.

### 2.     *Damages Claims Under § 504*

A parent has a private right of action to sue a school system for violating § 504.  *See, e.g.*, *Arline v. Sch. Bd. of Nassau Cnty.*, 772 F.2d 759, 760 n.1 (11th Cir. 1985) (citing *Jones v. Metro. Atlanta Rapid Transp. Auth.*, 681 F.2d 1376, 1377 n.1 (11th Cir. 1982)).  To prevail on a § 504 claim, a plaintiff must show "(1) the plaintiff is an individual with a disability under the Rehabilitation Act; (2) the plaintiff is otherwise qualified for participation in the program; (3) the plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the program solely by reason of his or her disability; and (4) the relevant program or activity is receiving federal financial assistance."  *See, e.g.*, *L.M.P. ex rel. E.P. v.*

---

[18]IDEA's reevaluation requirements, in general, require, *inter alia*: (1) evaluations need not occur more frequently than once a year, but must occur at least once every three years, unless the parents and school agree otherwise; (2) notice to the parent prior to evaluation; and (3) the school meets IDEA's evaluation requirements, such as the requirement that the school use a variety of assessment tools that are effective at determining the child's needs.  20 U.S.C. § 1414(a)(2), (b).

*Sch. Bd. of Broward Cnty., Fla.*, 516 F. Supp. 2d 1294, 1301 (S.D. Fla. 2007) (citations omitted). The only element that the parties in this case dispute is the third element.

> i.    Intentional Discrimination is Required to Recover Damages Under Section 504

To state a claim for compensatory relief under § 504, a plaintiff must show intentional discrimination. *See, e.g.*, *J.D.P. v. Cherokee Cnty., Ga. Sch. Dist.*, 735 F. Supp. 2d 1348, 1364 (N.D. Ga. 2010) (citing *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992)).

The definition of "intentional discrimination" in the § 504 special education context is unclear.  In 2010, the Eleventh Circuit stated that it "has not decided whether to evaluate claims of intentional discrimination under section 504 under a standard of deliberate indifference or a more stringent standard of discriminatory animus." *T.W. ex rel. Wilson v. Sch. Bd. of Seminole Cnty., Fla.*, 610 F.3d 588, 604 (11th Cir. 2010) (citing *Wood*, 978 F.2d at 1218-20).  In this case, neither party has made a serious contention that the discriminatory animus standard applies, and have apparently argued this case under the deliberate indifference standard.  Accordingly, this court will analyze the damages claims under that standard, which is a more lenient standard than discriminatory animus. *See J.D.P.*, 735 F. Supp. 2d at 1365 (analyzing a compensatory damages claim under § 504 using the deliberate indifference standard because the parties argued the case under that standard); *Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist.*, 239 F. App'x 484, 487 (11th Cir. 2007) (same).

In the Eleventh Circuit, to show deliberate indifference, "a plaintiff must prove that the defendant knew that harm to a federally protected right was substantially likely and that the

defendant failed to act on that likelihood." *T.W.*, 610 F.3d at 604 (finding no deliberate indifference on the part of a school system that placed a student with a teacher who abused the student and had a prior "proclivity toward abuse with students," because the school system "investigated all complaints of abuse that parents lodged" against the teacher, and "were unable to substantiate the complaints"). A defendant's "good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under section 504." *Wood*, 978 F.2d at 1219.

While Section 504 can be used as the basis for a cause of action in many contexts, it has taken on a unique meaning in the special education context when a plaintiff's claim is based on an alleged failure to accommodate. *See, e.g.*, *Monahan v. Nebraska*, 687 F.2d 1164, 1171 (8th Cir. 1982) (analyzing the standard under which § 504 special education claims must be brought by comparing § 504 to the IDEA); *Doe v. Arlington Cnty. Sch. Bd.*, 41 F. Supp. 2d 599, 608 (E.D. Va. 1999) ("*In the special education context*, the standard of proving a § 504 claim is extraordinarily high.") (emphasis added); *see also* 34 C.F.R. §§ 104.1-.54 (establishing separate regulations for § 504 in the following contexts: (1) employment; (2) accessibility; (3) preschool, elementary, and secondary education; (4) postsecondary education; and (5) health, welfare, and social services). Therefore, courts have applied a unique standard to § 504 special education failure-to-accommodate claims.

Much of that difference in treatment appears to come from the existence of IDEA. *See, e.g.*, *Sellers*, 141 F.3d at 529 (specifically stating that a § 504 disability discrimination claim is different than an IDEA claim). These courts have consistently held that it is harder for a plaintiff to prevail on a failure-to-accommodate claim under § 504 than a failure-to-accommodate claim

24

under IDEA, assuming that the plaintiff is covered under both § 504 and IDEA.[19]  *Id.*  A

Northern District of Georgia case, squarely facing the failure-to-accommodate issue under § 504,

stated that: "[t]o make a claim under section 504 in the education context, something more than

an IDEA violation for failure to provide a FAPE in the least restrictive environment must be

shown. . . . A plaintiff must also demonstrate some *bad faith or gross misjudgment* by the school

or that he was discriminated against solely because of his disability."  *W.C. ex rel. Sue C. v.

Cobb Cnty. Sch. Dist.*, 407 F. Supp. 2d 1351, 1363-64 (N.D. Ga. 2005) (citing *N.L. ex rel. Mrs.

C. v. Knox County Schs.*, 315 F.3d 688, 695 (6th Cir. 2003); *Sellers*, 141 F.3d at 529; *Monahan*,

687 F.2d at 1170; *Alex G. ex rel. Dr. Steven G. v. Bd. of Trustees of Davis Joint Unified Sch.

Dist.*, 387 F. Supp. 2d 1119, 1124 (E.D. Cal. 2005); *Brantley v. Indep. Sch. Dist. No. 625, St.

Paul Pub. Schs.*, 936 F. Supp. 649, 657 (D. Minn. 1996)).

 The above proposition—that § 504 claims necessarily require more than IDEA

violations—originated in part from dicta in an Eighth Circuit case called *Monahan v. Nebraska*.

In *Monahan*, the Eighth Circuit examined the differences between § 504 and IDEA.  687 F.2d at

1170.  The court noted, consistent with Supreme Court precedent, that § 504 "is not, generally

speaking, an affirmative action statute."  *Id.* (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 411,

(1979)).  Instead, § 504 merely prohibits "certain conduct on the part of recipients of federal

financial assistance."  *Id.*  Section 504 does not create "general tort liability for educational

malpractice."  *Id.*  To state a claim under § 504, "either bad faith or gross misjudgment should be

---

 [19]In this case, as previously noted, this court previously found that T.H. was not eligible
for IDEA, as opposed to finding that the Board treated T.H. appropriately under IDEA.
Accordingly, this court's earlier ruling does not mean that T.H.'s § 504 claims are automatically
precluded.

shown." *Id.* at 1171.  As a result, a school does not violate § 504 merely by failing to provide a

FAPE, by providing an incorrect evaluation, by providing a "substantively faulty individualized

education plan," or "merely because a court would have evaluated [a] child differently." *Id.*

Rather, "[s]o long as the [school] officials involved have exercised professional judgment, in

such a way as not to depart grossly from accepted standards among educational professionals,"

the school system is not liable under § 504. *Id.*

This dicta has been adopted by courts throughout the country.  *See, e.g.*, *D.A.*, 629 F.3d at

454; *N.L.*, 315 F.3d at 695; *Sellers*, 141 F.3d at 529; *Lunceford v. Dist. of Columbia Bd. of Educ.*,

745 F.2d 1577, 1580 (D.C. Cir. 1984).  The courts agree that "[t]he 'bad faith or gross

misjudgment' standard is extremely difficult to meet."  *See, e.g.*, *Doe*, 41 F. Supp. 2d at 609.[20]

For example, the D.C. District Court granted summary judgment in favor of a school

system despite its failure to provide the child an individualized education plan for two years, and

its failure to hold a timely due process hearing.  *Walker v. Dist. of Columbia*, 157 F. Supp. 2d 11,

13-14, 36 (D.D.C. 2001).  Similarly, in *Sellers*, plaintiffs alleged that their child's test scores in

fourth grade should have alerted a school system that the child needed special education, yet the

school system did not diagnose the child as disabled until shortly before the child turned

eighteen.  141 F.3d at 525.  The Fourth Circuit held that plaintiffs failed to state a claim, writing

that the plaintiffs' allegations stated, "at best, a negligence claim," due to misdiagnosis.  *Id.* at

528-29.  In *Torrence v. District of Columbia*, 669 F. Supp. 2d 68 (D.D.C. 2009), the D.C.

---

[20]While the Eleventh Circuit has not explicitly adopted this standard, district courts within the Eleventh Circuit, including another judge in this district, have.  *See, e.g.*, *JR ex rel. EAR v. Pike Cnty. Bd. of Educ.*, No. 2:06–cv–1120–MEF, 2008 WL 2438664, at *12 (M.D. Ala. June 13, 2008) (Fuller, C.J.)*; J.D.P.*, 735 F. Supp. 2d at 1364; *W.C.*, 407 F. Supp. 2d at 1363-64; *E.W. v. Sch. Bd. of Miami-Dade Cnty. Fla.*, 307 F. Supp. 2d 1363, 1371 (S.D. Fla. 2004).

District Court held that plaintiff failed to state a § 504 claim by alleging that the school system failed to timely evaluate her child. *Id.* at 72.

On the other hand, if a school system simply ignores the needs of special education students, this may constitute deliberate indifference. *See, e.g.*, *Scaggs v. N.Y. Dep't of Educ.*, No. 06-CV-0799 (JFB)(VVP), 2007 WL 1456221, *16 (E.D.N.Y. May 16, 2007) ("Plaintiffs' extensive list of Riverhead's failures and omissions with regard to disabled students, as set forth *supra*, combined with their assertions that defendants were aware of plaintiffs' disabilities, that plaintiffs' parents requested accommodation and programs to address such disabilities and that defendants intentionally refused to take any remedial or corrective action to remedy the problems, are sufficient to plead causes of action under the [Americans with Disabilities Act ("ADA")][21] and Section 504."); *BD v. DeBuono*, 130 F. Supp. 2d 401, 438 (S.D.N.Y. 2000) (denying summary judgment when officials knew plaintiffs needed more than ten hours of weekly therapy but adopted a rule limiting therapy to ten hours per student).

ii.     Significance of Regulatory Violations

As previously discussed, the Eleventh Circuit recognizes that a student, or a student's representative, has a private right of action to sue for a violation of § 504 and to recover damages. However, the Eleventh Circuit has not recognized a private right of action to enforce § 504's special education regulations.

---

[21]*See Fedorov v. Bd. of Regents for the Univ. of Ga.*, 194 F. Supp. 2d 1378, 1387 (S.D. Ga. 2002) (citing *Waddell v. Valley Forge Dental Assoc.*, 276 F.3d 1275, 1279 n. 3 (11th Cir. 2001)) (stating that because § 504 and the ADA are identical, "interpretations of one Act apply to the other").

Some parts of Ms. H's briefs imply that the Board can be liable to her under § 504 simply by violating one of § 504's regulations. *See, e.g.*, Doc. #90 at 2 ("MCBOE appears to be making the argument that Section 504 does not mean what it says, and that even if it did not comply with [Section 504's] regulations, it cannot be found to have discriminated against T.H."). If Ms. H truly meant this, she would effectively be arguing that she has a private cause of action to enforce § 504's regulations. However, Ms. H has not cited *Alexander v. Sandoval*, *Cort v. Ash*, or any of the seminal private cause of action cases to support this proposition.

While the Eleventh Circuit has not ruled on this issue, the weight of authority holds that there is no private right of action to enforce § 504's special education regulations, to the extent these regulations create any duties separate and apart from the statutory text. *See, e.g.*, *Power ex rel. Power v. Sch. Bd. of Va. Beach*, 276 F. Supp. 2d 515, 519 (E.D. Va. 2003) ("[N]o private cause of action exists to enforce this regulatory due process provision."); *A.W. by Ms. C. v. Marlborough Co.*, 25 F. Supp. 2d 27, 31 (D. Conn. 1998) ("A procedural error, by itself, is insufficient to warrant the protections of the Rehabilitation Act."); *Brennan v. Reg'l Sch. Dist. No. Bd. of Educ.*, 531 F. Supp. 2d 245, 278 (D. Conn. 2008) ("A violation of these regulations, solely in themselves, does not give rise to a private right of action under the Rehabilitation Act."). Instead, "to be enforceable through the 504 implied private right of action, regulations must be tightly enough linked to § 504 that they 'authoritatively construe' that statutory section, rather than impose new obligations." *Mark H. v. Lemahieu*, 513 F.3d 922, 922 (9th Cir. 2008) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001)).

Yet this court need not address whether there is a private right of action to enforce § 504's regulations because Ms. H conceded, in her final brief filed with the court on this issue,

28

that she does not assert a private right of action with respect to § 504's regulations.  Ms. H

clarified, when confronted with the argument that she has no private right of action to enforce

the regulations, that:

> Plaintiffs claim that . . . . MCBOE's failure to adhere to the applicable regulations
> is strong evidence that it discriminated . . . . Technical failures to adhere to
> regulations may not amount to discrimination.  However, consistent failure to adhere
> to the regulations combined with a failure on the part of school district personnel to
> even know what adherence to the regulations would mean results in a high likelihood
> of discrimination in violation of Section 504. . . . MCBOE's failure [to comply with
> procedural regulations] demonstrates that MCBOE is deliberately indifferent . . . .
>
> *Plaintiffs are not attempting to "assert a claim of procedural inadequacy, separate
> and apart from a claim of discrimination."*

Doc. #98-1 at 2-3, 6 (emphasis added).  In other words, based on this brief, it is clear that Ms. H

no longer argues that the Board can be liable due to a mere violation of one of § 504's

regulations.

However, violation of the § 504 regulations is still relevant to Ms. H's damages claim.

As previously stated, the Board can be liable to Ms. H if Ms. H can show that it acted with

deliberate indifference.  As Ms. H correctly suggests, If the Board ignores the regulations that

the Department of Education has ordered it to follow to ensure proper treatment of disabled

students, this may show that the school district is deliberately indifferent to the needs of disabled

students.  *See Mark H.*, 513 F.3d at 938.

4.      *Analysis of Ms. H's Damages Claim*

Ms. H claims that the Board is liable to her due to several categories of alleged § 504

violations, which the court will discuss in turn.

i.      Ms. H's Generalized Regulatory Allegations

Ms. H claims that the Board should be liable to her under § 504 due to its failure to follow § 504's regulations.  As previously discussed, whether her claims will be successful rests solely on whether the Board acted with deliberate indifference toward T.H.'s disability needs; a violation of a regulation does not mean the board is automatically liable.  Therefore, the issue is whether Ms. H can prove that the Board's behavior, including its alleged regulatory violations, was so severe that it demonstrates deliberate indifference.

The bulk of Ms. H's allegations have little probative value.  She argues, *inter alia*, that the Board is liable to her due to the fact that: (1) the Board failed to spell out in detail, in its Procedural Guide, when and how to conduct proper evaluations or reevaluations; (2) the majority of T.H.'s accommodations were made from a pre-printed checklist; (3) the accommodations on the pre-printed checklist were not good enough; (4) MPS refused to provide certain accommodations that Ms. H requested; (5) MPS failed to "provide services based on an adherence to procedures that satisfy the regulatory requirements;" (6) during one evaluation meeting, the evaluating team failed to discuss or review the results of outside evaluations obtained by Ms. H; (7) the tests administered to T.H. were not "validated;" (8) no "knowledgeable person" attended evaluation meetings or made placement decisions; (9) MPS did not use a sufficient amount and variety of information in evaluating T.H. and determining T.H.'s placements; and (10) MPS did not document the results of its evaluations.

The above allegations are problematic for several reasons.  First, some of these allegations are "garden-variety IDEA violations" that attack minor procedural issues rather than substance, which are not actionable under § 504.  *See, e.g.*, *Alston v. District of Columbia*, --- F.

Supp. 2d ----, 2011 WL 971610, at *7 (D.D.C. Mar. 21, 2011) ("Defendants' alleged misconduct between 2002 and 2006 amounts to nothing more than garden-variety IDEA violations, which do not reasonably suggest the existence of bad faith or gross misconduct").

Second, many of these allegations, and other similar allegations made by Ms. H throughout her briefs, merely recite the regulations promulgated under § 504, and, after making a generalized statement that the Board failed to comply with a particular regulation, argue that the Board has the burden of proving its compliance with the regulations. The court rejects this proposition. Ms. H's claim that the burden rests with the Board comes from a Ninth Circuit case, *Larry P. By Lucille P. v. Riles*, 793 F.2d 969 (9th Cir. 1984), that states, without citing authority: "[t]he regulations place the burden on the recipient to show it has complied with the requirements [in the regulations.]" *Id.* at 980. This case involved facts distinguishable from the instant case, and is not binding on this court. To the extent its facts are analogous to those at bar, this court will not follow the quoted statement in this case with respect to a claim for compensatory damages. Indeed, it would be odd if that proposition were true, because the weight of authority establishes that there is no cause of action for violation of § 504's regulations, without more. *See supra*.

In the Eleventh Circuit, consistent with ordinary civil cases, Ms. H bears the burden of proof. *T.W.*, 610 F.3d at 603-04 ("To succeed on his discrimination claim under section 504, [the plaintiff] must prove, by a preponderance of the evidence, 'that the [School Board] intended to discriminate against him on the basis of his disability.'") (quoting *Berg v. Fla. Dep't of Labor & Employment Sec.*, 163 F.3d 1251, 1255 (11th Cir. 1998)). The court sees no reason to deviate from that standard here. In the context of cross motions for summary judgment, Ms. H cannot

prevail on her motion for summary judgment, nor can she defeat the Board's motion for summary judgment (if the Board has satisfied its summary judgment burden), without making a sufficient showing on elements of the case for which she has the burden of proof. *See generally Celotex*, 477 U.S. at 322-23; *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (stating that once the moving party has met its summary judgment burden, "the non-moving party must make a sufficient showing on each essential element of the case for which he has the burden of proof").

As previously mentioned, if the Board blatantly violated provisions of the § 504 regulations, this is relevant, though not dispositive, to a claim of deliberate indifference. On the other hand, Ms. H cannot require the Board to prove its non-liability after Ms. H makes a generalized assertion that the Board violated the regulations. The court has extensively reviewed the evidence and argument submitted by Ms. H with respect to her above assertions, and this evidence shows, at most, minor violations of the § 504 regulations.

Finally, the court notes that part of Ms. H's argument is that the Board failed to establish proper § 504 procedures through its Procedural Guide. The court has reviewed the 2004 and 2010 versions of the Procedural Guide and finds that, while the Procedural Guide is not as detailed as the regulations itself, the Procedural Guide is not so lacking that it shows deliberate indifference. The slight omissions pointed out by Ms. H are far too minor to constitute deliberate indifference.

In sum, Ms. H's generalized § 504 arguments, at best, serve as minimal circumstantial evidence that the Board was deliberately indifferent toward T.H.

        ii.      Ms. H's Procedural Safeguard Claims

Ms. H claims that MPS failed to properly satisfy the procedural safeguards provision of the § 504 regulations by failing to provide a timely § 504 hearing.  However, as is evident from the facts relating to Ms. H's request for a § 504 hearing, discussed above, the Board's failure to provide a hearing exhibited, at worst, confusion, not deliberate indifference.

Ms. H also contends that MPS failed to give her a sufficient summary of her due process rights.  The Board, however, has submitted documents that it gives to parents pursuant to its Procedural Guide, and these documents do not appear to be so deficient (if at all) that they are evidence of deliberate indifference.  *See* Doc. #84-7 at 29-33.

In sum, Ms. H's procedural safeguard arguments do not support her deliberate indifference claim.

        iii.     Failure to Evaluate and Update T.H.'s Section 504 Plan

Ms. H contends that two particular facts establish deliberate indifference.  Ms. H's first contention is that, even when T.H. was receiving poor grades in school, she was rarely reevaluated pursuant to the § 504 evaluation regulations.  Ms. H notes that T.H.'s § 504 file contains no test or assessment results from 2001 through 2009, which suggests that T.H. was not given any new tests or assessments during those years.  *See* Doc. #69 at 55-56.  In fact, the only information in T.H.'s § 504 file that was provided to the court is new § 504 plans, without any new tests or assessments attached to those plans.

In response to the first argument, the Board does not directly deny that it did not conduct new tests or assessments each year that complied with the § 504 regulations.  Instead, it notes

that it "reviewed" and "revised" T.H.'s § 504 plans each year, and argues that it need not actually conduct a full-blown reevaluation with tests or assessments each year, under the § 504 regulations or otherwise.  While the court agrees with the general proposition that § 504 liability does not arise merely by the violation of a single § 504 regulation, *see supra*, a failure to conduct any new tests or assessments from 2001 through 2009, despite T.H.'s poor academic results, provides some evidence of deliberate indifference.

Ms. H's second argument is that T.H.'s § 504 plans were barely altered during her time at MPS, despite her poor grades.  For example, T.H.'s plans were barely altered from the beginning of ninth grade through the end of eleventh grade, despite the fact that T.H. had failed classes and graduation examinations during this time period.  Ms. H implies that this means that the Board virtually ignored T.H. for years, despite her academic struggles.

The Board's only response to Ms. H's second argument is that it believed that T.H.'s § 504 plans were adequate and that it was not required to provide any additional accommodations under § 504.

The court concludes that there is a genuine issue of material fact with respect to the two arguments Ms. H raises here.  On the one hand, Ms. H presents persuasive evidence that the Board simply ignored T.H. by failing to conduct tests or assessments, and by failing to significantly update T.H.'s § 504 plans despite T.H.'s poor grades.  On the other hand, it is not clear whether T.H.'s needs were being served by her § 504 plans.  Specifically, T.H.'s poor grades may have been caused not by a lack of accommodations but because T.H. put forth little effort in school and had a poor attitude.  MPS presented evidence that (1) T.H. was frequently absent or tardy from school; (2) T.H. had a poor attitude toward school and often did not

complete her work; (3) T.H. had conflicts at home with her mother; (4) T.H. and Mrs. H did not take advantage of opportunities, such as tutoring, to improve T.H.'s grades and improve her chances at passing her high school graduation examinations; and (5) T.H. was disciplined on at least three occasions.  The Board also presented evidence that it had trouble getting Ms. H to attend meetings and conferences.  Based on this evidence, and the high standard a plaintiff must meet to prevail on a special education § 504 claim, the Board may have thought that it was properly accommodating T.H., and T.H. was receiving poor grades because she was not taking advantage of those accommodations.  *Cf.* 29 U.S.C. § 794(a) (stating that exclusion, denial of benefits, or discrimination must be caused "*solely* by reason of . . . her disability") (emphasis added).  While the Board has some obligations under § 504, ensuring that each student succeed academically is not one of them.

In sum, while Ms. H has presented evidence that a reasonable jury could find shows deliberate indifference, the court notes that deliberate indifference is a very high standard to meet, and the only evidence before the court on that issue today is circumstantial.  Because ruling on this issue today would require weighing the evidence, which this court may not do in ruling on a motion for summary judgment, the court concludes that it would be improper to grant summary judgment in favor of either party at this time.  *Cf. Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist.*, 368 F. Supp. 2d 313, 336-37 (S.D.N.Y. 2005) (denying defendant's motion for summary judgment on § 504 due to "blatant" IDEA violation, but also denying plaintiff's cross motion for summary judgment, stating that a blatant IDEA violation does not automatically rise to the level of § 504 discrimination).

5.    *Declaratory and Injunctive Relief*

Ms. H also requests declaratory and injunctive relief under § 504.  The court concludes that the cross Motions for Summary Judgment are due to be DENIED with respect to Ms. H's claims for declaratory and injunctive relief.

With respect to injunctive relief, neither Ms. H nor the Board addresses the factors this court must consider prior to granting an injunction.  "To issue a permanent injunction under the ADA or the Rehabilitation Act, the Court must apply the same factors as it would in any other case in which a plaintiff sought a permanent injunction."  *Wilson v. Broward Cnty., Fla.*, No. 04-61068-CIV, 2008 WL 708180, at *1 (S.D. Fla. Mar. 14, 2008) (citing *Bercovitch v. Baldwin School, Inc.*, 133 F.3d 141, 151 (1st Cir.1998)).  "'[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that [she] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'"  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  Neither party mentions these factors, despite the fact that a party asking for summary judgment bears the "responsibility of informing the district court of the basis for its motion."  *See Celotex*, 477 U.S. at 322.  Thus, the court will not grant summary judgment to either party on the issue of injunctive relief.

36

The court will also not rule on the declaratory judgment issue at this time.  The decision to grant declaratory relief "is a matter for the court's sound discretion."  *Hollis v. Itawamba Cnty. Loans*, 657 F.2d 746, 750 (5th Cir. 1981).

The standard a plaintiff must meet to receive declaratory (or injunctive) relief under § 504 in the special education context differs from the deliberate indifference standard used to evaluate § 504 monetary damages claims.  Ms. H correctly points out that courts discussing the deliberate indifference standard for § 504 claims have generally referred to the deliberate indifference standard as the standard for a "compensatory damages claim" as opposed to the standard for claims for declaratory and injunctive relief.  *See, e.g.*, *J.D.P.*, 735 F. Supp. 2d at 1364; *K.U. v. Alvin Indep. Sch. Dist.*, 166 F.3d 341, at *3 n.3 (5th Cir. 1998) (unpublished) (suggesting that the standard for a § 504 damages claim differs from a § 504 declaratory or injunctive relief claim); *see also Wood*, 978 F.2d at 1219-20 ("*[C]ompensatory damages* are precluded in cases of unintentional discrimination, but are permissible on a showing of intentional discrimination.") (emphasis added).

However, while Ms. H argues (and the Board agrees) that the deliberate indifference standard is *not* the standard to be applied to a § 504 claim for declaratory or injunctive relief, neither Ms. H nor the Board articulates which standard *should* apply.  In fact, at the pretrial conference, both parties expressed uncertainty about which standard applies.  Ms. H suggests that the standard might be a "reasonable accommodation" standard, though neither she nor the Board provides any substantial discussion of this standard.  *See Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 847 (7th Cir. 1999) (holding that discrimination under § 504 may be established by showing "(1) the defendant intentionally acted on the basis of the disability, (2)

37

the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people").  Ms. H has also presented authority suggesting that a plaintiff can make a "disparate impact" claim under § 504, without showing discriminatory intent, though Ms. H is not bringing a disparate impact claim in this case.  *See, e.g.*, *Alexander v. Choate*, 469 U.S. 287, 292, 309 (1985); *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292 (5th Cir. 1981).

The court agrees that the standard to be applied to this type of claim is unclear.  For example, in a 1998 case, the Fifth Circuit implicitly noted the uncertainty when it deliberately avoided answering the question of what standard should be used for evaluating a claim for "injunctive or declaratory relief under § 504" in the special education context.  *K.U.*, 166 F.3d at, at *3 n.3.  Due to the legal uncertainty in this area of law, and the parties' failure to inform the court the standard under which it is to evaluate this claim, the court concludes that neither party has met its summary judgment burden to inform the court of the basis for its motion, with respect to Ms. H's claim for declaratory relief.

In short, summary judgment is due to be DENIED with respect to the issues of declaratory and injunctive relief.

## V.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1.      Ms. H's class claims are DISMISSED for lack of standing;

2.      Ms. H's Motion for Class Certification (Doc. #56) is DENIED AS MOOT;

3.      The cross Motions for Summary Judgment (Docs. ## 68 and 70) are DENIED;

4.      This case will proceed to trial with respect to Ms. H's individual § 504 claim and her request for attorney's fees claim.  The damages claim will be tried to a jury and the other claims to the court;

5.      The parties are DIRECTED to discuss in their trial briefs the standard that must be met by the Plaintiff to receive declaratory or injunctive relief under the § 504 claim.  They should either agree on the standard and state what it is, or, if they cannot agree, state and support their separate positions.

Done this 12th day of May, 2011.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE